Stark *v.* Lehigh Foundries, Inc., Appellant, et al.

2

Argued January 10, 1957. Before JONES C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*Thomas R. White, Jr.*, with him *A. Albert Gross, Gross & Herster* and *White, Williams & Scott*, for Lehigh Foundries, Inc., defendant, appellant.

*John B. O'Brien*, with him *John H. Cericola*, for plaintiff, appellee.

*Edward J. Fox, Jr.*, with him *Fox & Oldt*, for Metropolitan Edison Company, defendant, appellee.

*J. Douglas Fackenthal* and *Fackenthal, Teel, McGiffert & Danser*, for additional defendant, appellee.

OPINION PER CURIAM, March 18, 1957:

We are in accord with the determination of this action in trespass by the court en banc of Northampton County and the judgments entered in favor of Robert F. Stark against Lehigh Foundries, Inc. and in favor of the Metropolitan Edison Company are affirmed on the following portions of the extremely able opinion of President Judge BARTHOLD:

"Robert F. Stark brought this action in trespass against Lehigh Foundries, Inc., Metropolitan Edison Company and Collins & Maxwell, Inc., to recover damages for permanent injuries sustained by him while engaged in the performance of his duties as a helper about a crane which suddenly became electrified by a nearby power line of Metropolitan Edison on May 13, 1953.

"Lehigh Foundries, Inc., was the owner and occupier of an industrial plant and railroad siding. The power lines of Metropolitan Edison Company ran above and across the railroad siding to a transformer station also owned by Lehigh Foundries, Inc. Lehigh Foundries, Inc., from time to time required long boom cranes to unload tubing from railroad cars on its siding. Collins & Maxwell, Inc. usually supplied the cranes, but when cranes of its own were not available it arranged with another contractor to supply the necessary crane. In the instant case the crane was furnished by John Frank Posh, trading as Posh Construction, together with an operator, Mark (Marlin) Engler, and a helper, Robert F. Stark, plaintiff herein.

"Metropolitan Edison Company joined as additional defendants, John Frank Posh, trading as Posh Construction, and Mark Engler.[1]

"[1] Lehigh Foundries, Inc. will be referred to as 'Lehigh'; Metropolitan Edison Company as 'Metropolitan'; John Frank Posh,

"The jury returned a general verdict for plaintiff in the sum of $111,103.42 against Lehigh, Metropolitan and Posh. Supplementary thereto the jury made special findings adjudging Lehigh, Metropolitan and Posh guilty of negligence, and absolving Engler from negligence, and plaintiff from contributory negligence.

"Defendant, Collins & Maxwell, Inc., had been eliminated as a defendant by direction of the Court.

"Lehigh, Metropolitan, and Posh filed motions for judgment n. o. v. and for a new trial. These motions are now before the Court.

"Lehigh's motion for judgment n. o. v. raises two questions: (1) was there sufficient evidence of Lehigh's negligence to submit to the jury? (2) If so, was Lehigh's negligence a proximate cause of the injury?

"Considering all the evidence and all reasonable inferences therefrom in the light most favorable to plaintiff, as we are required to do in considering motions for judgment non obstante veredicto,[2] the following facts must be taken as established:

"Lehigh owned and occupied an industrial plant and railroad siding. Metropolitan's power lines ran above and across Lehigh's railroad siding to a transformer station also owned by Lehigh. The current (34,500 volts) was delivered to Lehigh's transformer station and was thereafter utilized by Lehigh. The power lines were erected, maintained and inspected by Metropolitan.

· "On the day of the accident, May 13, 1953, and on the previous day, Posh supplied Lehigh with a long

trading as Posh Construction, as 'Posh'; and Mark (Marlin) Engler as 'Engler'."

"[2] Miller v. Hickey, 368 Pa. 317, 325; DiGregorio, Admr. v. Skinner et al. (No. 1), 351 Pa. 441; Carter et al. v. Pittsburgh Railways Co., 327 Pa. 586; O'Farrell v. Mawson et al., 320 Pa. 316; Richardson v. Wilkes-Barre Transit Corp., 172 Pa. Superior Ct. 636, 638."

boom crane, a crane operator and a helper to unload tubing from railroad cars on Lehigh's siding. Engler was the crane operator and plaintiff was his helper. On the day of the accident, Lehigh's foreman spotted the railroad cars immediately underneath Metropolitan's power lines and directed Engler where the work was to be done. Four of Lehigh's employees assisted in the unloading operation. The work proceeded under the direction of Lehigh's foreman who was there when the work began and at intervals during the day until the work was completed, when Lehigh's foreman and employees left the railroad siding. Engler and plaintiff then began knocking out the stabilizing blocks underneath the crane preparatory to moving the crane from Lehigh's premises. While plaintiff was on the ground alongside the crane in the act of placing a sledge hammer in the tool box of the crane the 40-foot boom of the crane operated by Engler came in close proximity to Metropolitan's power lines above the unloading area causing the current carried in one of the power lines to arc from the line to the boom of the crane. The current passed through the crane and into plaintiff's body causing serious injury. On the previous day a similar unloading operation took place on Lehigh's premises but the work was done in a safe place some distance away from Metropolitan's power lines. On the day of the accident there was no need to conduct the work immediately underneath Metropolitan's power lines. There was ample room elsewhere on the railroad siding to unload cars a safe distance from the power lines.

"Plaintiff, while aware of the presence of the power lines, was not aware of the high voltage carried through them, nor was he aware of the danger of arcing. The power lines were 24 feet or more above the ground and

it was impossible to determine from the ground whether or not they were insulated. The president of Lehigh so testified.

"Posh had furnished mobile cranes to Lehigh on many previous occasions for use in unloading cars on Lehigh's railroad siding. He had been on the premises and knew of the existence of the power lines over the railroad siding. Although he knew of the danger of arcing, he did not notify plaintiff or Engler of this hazard and did not equip crane with a protective grounding device, in accordance with accepted general safety practice in the business and as mandatorily required under the 'Rules for Cranes and Hoists' promulgated by the Department of Labor and Industry of the Commonwealth of Pennsylvania pursuant to statute.

"Lehigh had actual knowledge of the danger involved. Lehigh's president testified that he knew that cranes were operated from time to time in the vicinity of the power lines; that he knew of the high voltage carried in the lines; and that he knew also of the phenomena of arcing. In spite of this knowledge, no warning of the danger was given to Lehigh's foreman or its employees or to Posh and his employees, Stark and Engler. It is admitted of record that Lehigh did not notify Posh that the work was to be performed immediately underneath the power lines.

"It is contended by Lehigh that, 'there was no latent or hidden defect or dangerous condition but rather an obvious condition which was apparent to anyone coming upon the premises,' and that 'there is nothing showing . . ., that Lehigh Foundries had any knowledge of arcing, flaring or discharge (short of contact of the crane boom with the wire) which was superior to that of Engler or Stark,' and that therefore the evidence was insufficient to establish negligence on the part of Lehigh.

"We must reject both arguments as of little force. Our ruling, we think, is in harmony with well established legal principles.

" 'The duty of a possessor of premises toward a business invitee is an affirmative one, viz., to keep the premises in a reasonably safe condition or warn of dangers thereon which the occupier knows or should know exist: .... There is no duty, however, upon the possessor of land to warn or guard a business invitee against a danger that is obvious:' *McCreery v. Westmoreland Farm Bureau Co-operative Association*, 367 Pa. 567, 570; *Walker v. Broad and Walnut Corp. et al.*, 320 Pa. 504, 506; *Rice et al. v. Kring*, 310 Pa. 550, 555; see also Restatement, Torts, sec. 343.

"The presence of the power lines in and of itself did not indicate obvious danger. Plaintiff was not bound to know the degree of danger involved. 'Wires charged with an electric current may be harmless, or they may be in the highest degree dangerous. The difference in this respect is not apparent to ordinary observation, and the public, therefore, while presumed to know that danger may be present, are not bound to know its degree in any particular case:' *Fitzgerald v. Edison Electric Co.*, 200 Pa. 540, 543; *MacDougall v. Penn. Power & Light Co.*, 311 Pa. 387, 392; *Kaufman v. Pittsburgh Railways Co.*, 363 Pa. 96, 100; *Brillhart v. Edison Light & Power Co.*, 368 Pa. 307, 314.

"Lehigh, on the other hand, *was bound* to know the degree of danger involved. Those handling electricity of high voltage are not only bound to know the extent of the danger but to use the very highest degree of care practicable to avoid injury to everyone who may be lawfully in proximity to such wires and liable to come accidentally or otherwise in contact with them: *Fitzgerald v. Edison Electric Co.*, supra, 543; *Ashby v.*

*Phila. Electric Co.*, 328 Pa. 474, 478; *MacDougall v. Penn. Power & Light Co.*, supra, 392; *Brillhart v. Edison Light & Power Co.*, supra, 312.

"In our view, the testimony of Lehigh's foreman, standing alone, convicts Lehigh of negligence. He testified that on the day of the accident he directed the crane operator where the work was to be done and spotted the cars underneath the high tension lines, whereas on the previous day the cars had been spotted a safe distance away from the high tension lines. Lehigh is responsible for the false sense of security induced by the directions of Lehigh's foreman. Plaintiff had the right to assume that one in authority would not lead him into danger without warning: *Debenjak v. Parkway Oil Co.*, 159 Pa. Superior Ct. 603, 607; *Newingham v. J. C. Blair Co.*, 232 Pa. 511; *Christman et al. v. Segal*, 143 Pa. Superior Ct. 87; *Teets v. Crescent Portland Cement Co.*, 123 Pa. Superior Ct. 85, 93.

"Plaintiff, entering the premises not only for his employer Posh but in the interest of Lehigh, was entitled to assume that Lehigh had performed its affirmative duty to keep the premises in a reasonably safe condition or warn of dangers thereon which Lehigh knew or should have known existed. Since the danger was not patently obvious plaintiff was not required to make an independent survey to determine whether Lehigh had in fact performed its duty: *Kulka v. Nemirovsky*, 314 Pa. 134, 139; *Debenjak v. Parkway Oil Co.*, supra, 607.

"The further argument is presented 'that the law of Pennsylvania does not require an employee to work in a dangerous position and if he does so with knowledge of the potential danger and continues to work without protest he assumes the risk:' *Flaherty v. McClintic-Marshall Construction Co.*, 243 Pa. 580; *Reilly*

*v. Phila. Sub. Gas & Electric Co.*, 295 Pa. 402; *Com. Trust Co. of Pittsburgh v. Carnegie-Illinois Steel Co. et al.*, 353 Pa. 150. We have no quarrel with this rule but deem it inapplicable to the facts of the present case. There was no proof that plaintiff knew of the potential danger. The proof is to the contrary. Moreover, as plaintiff was employed by another and not by Lehigh the doctrine of assumption of risk did not apply to him: *Kulka v. Nemirovsky*, supra, 139.

"The fact that the accident occurred after the completion of the unloading operation and after Lehigh's foreman and employees left the premises does not absolve Lehigh from liability. The crane had not been moved from the position in which it was placed when the work commenced. Upon completion of the work, the crane boom remained in the position in which it had come to rest after the last piece of tubing had been loaded, and the arcing occurred when the crane boom was moved from that position preparatory to removing the crane from Lehigh's premises. In light of the fact that Lehigh's foreman spotted the cars immediately underneath the high tension lines and directed the work to be done in such dangerous locality, we have no hesitancy in finding that the placement of the crane at the start of the work and the moving of the crane from its initial position preparatory to taking it off the premises was all part of the unloading operation. In the circumstances the presence or absence of Lehigh's foreman or other employees is of no moment.

"We also reject the contention that the proximate cause of the accident was the boom of the crane coming in close proximity to the wires. The evidence justified a finding that Lehigh negligently created a dangerous condition by spotting the railroad cars underneath the high voltage lines and by directing or permitting the work to be done in proximity to such lines,

without warning Posh or his employees, Stark and Engler, of the latent danger. The evidence also justified a finding that such breach of duty on the part of Lehigh was a proximate cause of plaintiff's injuries: *Ashby v. Phila. Electric Co.*, supra.

" ' "One who negligently creates a dangerous condition cannot escape liability for the natural and probable consequences thereof, although the innocent act of a third party may have contributed to the final result." And when there are two contributing acts, it is not proximity in time that determines which of them is the proximate cause of the resulting injury:' *Mars v. Meadville Telephone Co.*, 344 Pa. 29, 31. An intervening negligent act is not always a superseding cause which relieves an antecedent wrongdoer from liability for negligently creating a dangerous condition which results in injury. Restatement, Torts, sec. 447. In determining whether an intervening force is a superseding cause, the Supreme Court in *Hendricks v. Pyramid Motor Freight Corp.*, 328 Pa. 570, 574, stated: 'The answer to this inquiry depends on whether the (intervening) conduct was so extraordinary as not to have been reasonably foreseeable, or whether it was reasonably to be anticipated:' Restatement, Torts, sec. 435 (2) ; *Roadman v. Bellone*, 379 Pa. 483, 492, 493; *Thornton, Admrx. v. Weaber, Admr.*, 380 Pa. 590, 595.

" 'The question of what is the proximate cause of an accident is almost always one of fact for the jury:' *Ashby v. Phila. Electric Co.*, supra, 479; *Helmick v. South Union Twp.*, 323 Pa. 433, 439; *Murray v. Pittsburgh Athletic Co.*, 324 Pa. 486, 493; Restatement, Torts, sec. 447.

"Under the evidence and the law applicable thereto, Lehigh's motion for judgment n.o.v. must be dismissed.

"In support of its motion for judgment n.o.v., Metropolitan contends that the evidence fails to show causative negligence on its part.

"Plaintiff presented no evidence to suggest that Metropolitan's power lines were defectively constructed or maintained. The principal averment against Metropolitan was its alleged negligence 'in constructing and maintaining high voltage lines directly over and above a railroad siding, when it knew or should have known that mechanical devices such as mobile cranes would be used for loading and unloading freight cars in dangerous proximity to its wires.' This charges Metropolitan with knowledge, actual or implied, that mobile cranes would be used in dangerous proximity to its power lines. In answer to this charge Metropolitan contends that the proofs disclose that it had no knowledge, actual or implied, that cranes would be used in dangerous proximity to its power lines; that the use of mobile cranes underneath its lines was intermittent or occasional, wherefore reasonable inspection was not bound to disclose such use; and that in these circumstances there was no duty upon Metropolitan to anticipate a dangerous condition created by third parties.

"The legal principles governing the opposing theories presented are well established and have been reiterated many times. 'While the degree of care . . . required of one maintaining or operating electric wires is of the highest, the concomitant duty is ". . . to install (such) lines in a safe and proper manner and thenceforth to maintain them in a safe condition upon 'reasonable inspection from time to time': . . . ." ' *Durinzi, Admr. v. West Penn Power Co.,* 357 Pa. 576, 580 (citing cases).

" 'Where a supplier of electricity has installed its high tension lines in a safe and proper manner on the land of another and has neither knowledge nor notice

that the possessor of the land is conducting an activity thereon which makes the line dangerous to people working on the land, it is not subject to liability for the electrocution of a workman resulting from this activity. Before knowledge of a fault or other condition can be visited constructively, the situation must not only have existed a sufficient length of time for its due discovery but it must also be capable of ascertainment upon the inspection, observation or supervision legally required of the one sought to be bound with such knowledge:' *Reed v. Duquesne Light Co.*, 354 Pa. 325, syl. 2, 3. 'There is no law requiring such an inspection of insulated wires as will make their owner virtually an insurer of the safety of anyone who by any possibility may come in contact with them. All that (is) required under the circumstances here (is) reasonable inspection from time to time:' *Matlack v. Penna. Power & Light Co.*, 312 Pa. 206, 210. There is no duty imposed upon the supplier of electricity to keep the land underneath the lines under constant surveillance. There is no duty of continuing inspection: *Reed v. Duquesne Light Co.*, supra, 331.

"Measured by these legal principles, plaintiff failed to prove negligence on the part of Metropolitan. Plaintiff did not prove that Metropolitan had actual notice of the use of the crane underneath Metropolitan's power lines on the day of the accident or at any other time. Metropolitan affirmatively established, without contradiction, that it was not notified that Lehigh and Posh intended to conduct an unloading operation with the use of a long boom crane on Lehigh's railroad siding immediately underneath its power lines.

"Plaintiff attempted to prove knowledge on the part of Metropolitan through Metropolitan's superintendent, who occasionally passed the railroad siding going to and from work. While Metropolitan's superintendent

14

testified that he knew that cranes were operated on the railroad siding, he did not at any time see cranes operated immediately underneath the power lines. On the contrary, he testified that the cranes which he saw on the siding were not operated in the vicinity of the power lines.

"The evidence is uncontradicted that the position of the crane on the day of the accident immediately underneath the power line was not permanent. Cranes were moved in and out of Lehigh's railroad siding from time to time as Lehigh's need indicated. On May 12, the day before the accident, cars were loaded and unloaded at a point a safe distance from the power lines. The work could have continued at the same place on May 13, the day of the accident.

"In these circumstances it cannot be said that reasonable inspection from time to time would have disclosed Lehigh's use of mobile cranes underneath the power lines. An inspector for Metropolitan, when upon the property of Lehigh for periodic inspection of the power lines, would not have found any cranes near the lines if the cranes were then in use on some other part of Lehigh's property, as they might well have been. What was said in *Reed v. Duquesne Light Co.,* 354 Pa. 325, 330, 331, is directly applicable to the facts of the instant case. 'To hold, in such circumstances, that the Light Company had reason to know that cranes were being used in the locality of the power lines would be tantamount to imposing upon the Light Company a duty to keep the land underneath the lines under constant surveillance. And, such was not the Light Company's duty.'

"In the erection of its poles and wires, Metropolitan was bound to anticipate only such combination of circumstances, and accidents and injuries therefrom, as it may reasonably forecast as likely to happen: *Mirnek*

*v. West Penn Power Co.*, 279 Pa. 188, 191. 'In Pennsylvania, liability for negligence depends on the antecedent probability, not the mere possibility, of harmful results therefrom. The general test of liability is whether the injury imputed to the defendant is such that a person of ordinary intelligence would have foreseen it as the natural and probable outcome of his conduct:' *Rugart v. Keebler-Weyl Baking Co.*, 277 Pa. 408, 413; see also *Matlack v. Penna. Power & Light Co.*, supra, 210.

"In the present case there is no evidence from which a jury could properly conclude that Metropolitan was 'bound to anticipate' that a long boom crane would be used immediately underneath its high tension lines when there was ample room elsewhere on the railroad siding to operate the crane a safe distance from the high tension lines. What was said in *Mirnek v. West Penn Power Co.*, supra, at page 191, is apposite to the facts of the instant case,—'If the present complaint had been of a defect in the poles or wires, arising from the manner of construction, or because of an observable deterioration or one arising from lapse of time, liability might be predicated thereon, if injury resulted from such negligence. But where, as here, that which had been safe, became harmful only by reason of the action of a third party, which defendant was not required to anticipate, and a sufficient time had not elapsed to charge it with constructive notice of this particular kind of dangerous condition, actual notice is required, for a defendant is not obliged to seek for defects of this character, or to assume they may arise.' See also *Reed v. Duquesne Light Co.*, supra, and *Durinzi, Admr. v. West Penn Power Co.*, supra.

"Plaintiff also attempted to prove that Metropolitan was negligent in permitting its power lines to sag below a safe level. Plaintiff offered testimony to show

that there was a sag in the power line above the railroad siding of 2 to 3 feet and that at the bottom of the sag the lines were 24-25 feet above the ground. Other witnesses called by the plaintiff testified that the power lines were 28-30 feet high. There was no evidence that the amount of sag was either excessive or unsafe. Manifestly, the power lines were well out of harm's way unless long boom cranes were used underneath them. We have already indicated that Metropolitan was not 'bound to anticipate' such use. Furthermore, even if it is assumed that the wires did sag improperly there is not a scintilla of proof to indicate how long that condition existed. Plaintiff had the burden of proving that Metropolitan knew or should have known of the alleged sag in its power lines. Plaintiff failed to meet this burden.

"For the reasons herein given, Metropolitan's motion for judgment n.o.v. must be granted."
\* \* \* \*

In the lower court Lehigh Foundries advanced seven reasons in support of its motion for a new trial. Upon this appeal only the sixth and seventh of those reasons —those contending that (6) "there was no evidence to support the finding of permanent total disability" and (7) "the verdict was excessive"—were argued.
\* \* \* \*

"The sixth argument advanced by Lehigh . . . relates to the sufficiency of the evidence to support a finding of future loss of earning power.

"Lehigh avers, 'that there was no evidence to support the finding of permanent total disability.' Posh avers that 'Plaintiff failed to produce sufficient legal proof of his earning power and is therefore not entitled to recover anything for such alleged loss.'

"In the brief submitted by Lehigh it is stated: 'The defendant has no quarrel with the finding that the

plaintiff is permanently disabled. It is submitted, however, ... that the jury must have found under the charge of the Court that the plaintiff's disability was not only permanent but total, in view of the amount of the verdict . . ., that there is no basis in the evidence for a finding of total disability . . . and that such a finding must have been based upon pure conjecture, guess, sympathy and/or prejudice.'

"The argument assumes that the size of the verdict necessarily indicates that the jury found that plaintiff was permanently and totally disabled. We cannot accept this argument in light of the serious injuries suffered by plaintiff. The numerous elements of proved damage when considered in their cumulative significance warranted an award of substantial amount. Assuming, arguendo, that the jury did make a finding of permanent total disability, we are convinced that there was substantial evidence from which, if believed, the jury could properly make a finding of total permanent disability resulting in total loss of future earning power.

"Plaintiff's testimony reveals the following: Plaintiff, before going into the Army, was a machine operator and earned $1.20 per hour for a 40-hour week. He then went into the Army and was sent to Korea. While in the Army he was advanced from Private to Corporal and then to Sergeant. After leaving the Service he was employed by Posh, first as a rigger, and later as an oiler on a crane. His employment with Posh began approximately one year prior to the accident and continued to the date of the accident, when he was earning $2. per hour for a 40-hour week, or $80. per week as an oiler on a crane. Prior to the accident his health was good. He had never been seriously ill and did not suffer from any disability. He has not worked since the accident. He tried to do some work at home but

found that he could not perform even light tasks because of the pain in his feet and because of his nervous condition. He still suffers pain and cannot walk for long distances. He has headaches two or three times a week. He is nervous, tense and weak. His head shakes from side to side. He has a light-headed feeling and gets dizzy spells which on several occasions caused him to fall to his hands and knees. His dizziness is constant and he has 'a sort of pressure like a tightening around his head.'

"As to plaintiff's condition prior to the accident, his mother testified: 'Before the accident Robert was like any other young man. He was cheerful, happy, did things as other boys did. . . . He went out on dates, which he can't do now . . . . He mowed the lawn, helped his daddy paint and do carpenter work and things like that . . . . His health was good.' As to the change in plaintiff's physical and mental condition after the accident, his mother testified: 'He doesn't do things like he used to. He isn't as happy as he was, he cries at times, he closes himself in his room, and you can't talk to him . . ., he is very easily hurt, and he gets mad very quickly. . . . He can't do work around home . . . . He tried to help . . . with the dishes and he'd maybe dry two or three dishes and he'd have to go and sit down or walk away in the other room. He just couldn't stand long enough . . . . Everything is different . . . he is just a different boy.'

"Plaintiff's father testified, that before the accident plaintiff 'was a very lively boy . . . just like any ordinary boy and was never sick.' As to his changed physical and mental condition after the accident, plaintiff's father testified, 'He is very quiet and nervous and very touchy. If you say something that doesn't suit him . . . he gets worked up and walks away and you have to be careful when you talk to him . . . . He is very

quiet, . . . mostly up in his room. He gets pretty tired. He tries to do things . . . . Something is always bothering him . . . and he sits down and he never tells you about anything that hurts him . . . but just walks away . . . . He tries to do things, and then something upsets him, and off he goes.'

"Marvin R. Geiger, an industrial engineer, testified that while plaintiff was with him in the National Guard, plaintiff was able to withstand full basic training 'such as infiltration courses, crawling on hands and knees under machine gun fire,' and that 'he didn't show any anxiety or fear' and 'was never morose or despondent.'

"Doctor George R. Greenwood, a specialist in general surgery, described plaintiff's injuries as follows: 'Plaintiff had burns of all four extremities . . . . He had first, second and third degree burns of the left lower extremity . . . the right foot and ankle . . . and right hand, . . . third degree burns of the left middle finger and the interphalangeal joint . . . the back part of the near portion of the right thumb . . . the index finger . . . the sole of the right foot . . . the bottom aspect of the right great toe and the medial portion of the ankle and the left lower extremity . . . about three-quarters encircling the leg and about half of the thigh. . . . On the soles of the feet . . . there were third degree burns which meant that the skin was completely burned away . . . he was right down to tendon, nerves and muscle in these burned areas.'

"While in the hospital plaintiff had to undergo five painful skin-grafting operations which necessitated the taking of skin from other portions of plaintiff's body leaving a patchwork of permanent scars.

"Upon plaintiff's discharge from the hospital he had only 74 degrees flexion of the knee joint and diminished flexion of his left middle finger. The skin-grafts on the soles of his feet had taken adequately but gave plain-

tiff considerable pain because the normal padding of the feet could not be replaced by a skin-grafting operation. This left plaintiff's feet without the normal walking surface. The structures beneath, viz., nerves, tendons and muscles, did not have the protective padding of fat and the normal thick layer of skin. As a result of the skin-grafting operation on the soles of plaintiff's feet, plaintiff developed planter warts which caused 'extra pointed areas of pressure and added pain upon walking.'

"Doctor Greenwood testified without qualification that the condition of plaintiff's feet is permanent, that the pain in his feet will continue as long as he lives, that plaintiff will not be able to work standing upon his feet for long periods of time, and that the scars on plaintiff's body will remain with him for the rest of his life. Doctor Greenwood then stated that in his professional opinion plaintiff's injuries 'will permanently disable plaintiff *from performing work as a laborer in the general labor market.'* (Emphasis supplied)

"Doctor Charles W. Iobst, a specialist in psychiatry and neurology, made the following positive findings from his neurological examination of plaintiff:'. . ., there was a mild lower facial weakness bilaterally, with further suggestion of what we call mild encephalitic facies. . . . In plain terms, more or less of a poker face, a face that was more devoid of emotional expression than normal. . . . there was a mild rythmic gross tremor of his head. . . . It was a rotating type of tremor. And a more pronounced tremor of both outstretched hands, being more marked on the left. . . . all deep reflexes in his left upper extremity were diminished, as compared to those on the right. . . . involvement to suggest some degree of post-shock encephalitis (which means) an inflammation of the brain substance—with involvement of the basal ganglia and hypothalamus. . . . structures

that . . . are down in the brain stem, and . . . have to do with emotional control.'

"Doctor Iobst testified further that the brain damage sustained by plaintiff as a result of the severe electric shock received by him on May 13, 1953, caused a tremor of his head and hands, a deadpan type of expression on his face, a slurring of his speech, hypersalivation (excessive saliva) and emotional hyperlability. The doctor also testified that plaintiff's recent memory impairment—'forgetfulness, absentmindedness' —was 'most probably due to damage to the frontal lobes of his brain,' that all plaintiff's complaints and the medical findings 'are compatible with . . . post-accident brain changes,' that 'individuals with such incapacity or such involvement are more vulnerable . . ., to any stress that they may meet in their subsequent life than the average person, whose brain is uninjured,' that from a psychiatric standpoint the abnormal functioning of the injured areas of the brain posed a potentially serious problem because 'any stress that is placed on this boy will cause an over-reaction and an over-emotional response.'

"On the question of permanent disability, Doctor Iobst testified that 'the present condition of the plaintiff with regard to the tremors, his nervousness, his brain involvement, is permanent,' that 'these disabilities are permanent in nature,' that plaintiff 'cannot resume his former occupation' and will be unable to perform laboring duties such as an oiler on a crane, or a rigger. (Emphasis supplied)

"All of the foregoing medical testimony was uncontradicted. Defendants did not call any witnesses, medical or otherwise, to prove that plaintiff could continue to perform his customary work.

"Under the uncontradicted evidence and the law applicable thereto, it is clear that the jury was justified

in finding that plaintiff was totally and permanently disabled and that he suffered a total loss of future earning power.

"It is the law that the issues of the amount of earnings lost subsequent to an accident and the present worth of plaintiff's future loss of earning power are solely jury questions and the weight of the evidence on such issues must be passed upon by the jury: *Bochar v. J. B. Martin Motors, Inc.,* 374 Pa. 240. It was the duty of the jury to determine from the evidence whether plaintiff's impairment of earning power would last until the end of his life expectancy or, if not, how soon it would probably change for the better and adjust their award by the present worth rule accordingly: *Kimotek v. Anast,* 350 Pa. 593, 599; *McCaffrey v. Schwartz,* 285 Pa. 561, 567.

"The evidence strongly indicated that plaintiff's injuries were such as to disable him entirely from following his occupation. *Simpson v. Penna. Railroad Co.,* 210 Pa. 101; *Ruse v. Pittsburgh Railways Co.,* 247 Pa. 295; *Hysong v. Kenny Transfer Co.,* 304 Pa. 102, 105; *Bochar v. J. B. Martin Motors, Inc.,* supra, 244.

"The trial Court submitted to the jury the question of the extent of plaintiff's disability and consequent loss of future earnings in a charge carefully following the rules of law on the subject. Although there was no evidence whatsoever presented by defendant to contradict the medical and other testimony indicating plaintiff's permanent total disability, the trial Court did charge the jury on permanent partial disability in accordance with defendants' theory of the case relative to damages.

"Under the law and the uncontradicted evidence produced by plaintiff, there is little room for doubt that the evidence was sufficient to support a finding of total disability resulting in total loss of earning power.

"There remains for consideration the contention that the verdict of $111,103.42 returned by the jury was excessive.

"The Supreme Court has enunciated the rule that, 'It is the duty of the lower Court to control the amount of the verdict; it is in possession of all the facts as well as the atmosphere of the case, which will enable it to do more evenhanded justice between the parties than can an appellate court': *Clark v. Horowitz*, 293 Pa. 441, 444; *Bochar v. J. B. Martin Motors, Inc.*, 374 Pa. 240, 241, 242; *King v. Equitable Gas Co.*, 307 Pa. 287.

"The Court is not warranted in setting aside, reducing, or modifying verdicts for personal injuries unless unfairness, mistake, partiality, prejudice, or corruption is shown, or the damages appear to be grossly exorbitant. The verdict must be clearly and immoderately excessive to justify the granting of a new trial. The amount must not only be greater than that which the Court would have awarded, but so excessive as to offend the conscience and judgment of the Court. *Deziak et al. v. Swaney*, 289 Pa. 246, 252; *Holden v. Penna. R. R. Co.*, 169 Pa. 117; *Gale v. Phila.*, 273 Pa. 275; *Goldman v. Mitchell-Fletcher Co.*, 285 Pa. 116; *McIntyre v. Quaker City Cab Co.*, 283 Pa. 395, 396. The imperative test of excessiveness of the verdict is whether it shocks the sense of justice of the Court: *Fasick v. Byerly*, 331 Pa. 85.

"Plaintiff's verdict cannot be said to be ordinary, nor were his injuries. His injuries were admittedly of a most serious nature. We have discussed them in detail in our prior analysis of the medical testimony. Upwards of 20,000 volts of electricity passed through plaintiff's body causing deep burns in his feet and one of his hands and damaging his brain and nervous system. The brain injury has left him with a tremor of

the head and hands, excessive salivation and a 'dead-pan' expression on his face. The brain injury has also seriously affected his emotional behavior. He has been left with permanent scars, due to numerous skin-grafting operations. He has suffered most severe pain and will continue to suffer pain as long as he lives. It is the uncontradicted medical testimony that all of these injuries including his disfigurements, deformities, pain and suffering and mental anguish, are permanent. These matters must all be taken into consideration in measuring the size of the verdict awarded him.

"Plaintiff proved hospital, surgical and medical expenses totalling $2,500 and, according to the uncontradicted evidence, will be required to expend additional sums in the future at the rate of $100 per year.

"Plaintiff was a steady worker of good habits, and at the time of the accident was earning $80 a week, or $4,160 per year. He proved loss of earnings from the time of the accident, May 13, 1953, to the date of trial, October 10, 1955, a period of 125 weeks, in an amount slightly in excess of $10,000. Plaintiff was 24 years of age, and according to the Mortality Tables had a life expectancy of 43 years at the time of the accident. He was earning a little over $4,000 a year. If we treat money as producing 5% net, the present value of $4,-000 for 43 years, according to the Giauque and McClures 'Present Worth Tables' is $70,183.60. If 4½% is used in figuring present worth, the sum receivable at the date of the verdict would be $75,496.80. If 4% is used, the sum would be $81,483.20.

"In addition to the above allowances, plaintiff is entitled to reasonable compensation for his past and future physical pain, suffering and inconvenience, and for his past and future mental distress and anxiety resulting from the physical injury. In the instant case there was uncontradicted testimony that plaintiff has

a permanent tremor of the head, excessive salivation, a deadpan expression upon his face arising from the injury to his brain, and many permanent scars on his legs and body resulting from skin-grafting operations. These conditions, in our opinion, constitute disfigurements or deformities causing mortification to plaintiff which must also be taken into consideration in measuring the size of the verdict.

"Considering the plaintiff's expenditures for hospitalization and medical attention, past and future; his loss of past earnings; the extent and permanency of the injury to his brain and nervous system, and the disabilities arising therefrom; his pain and suffering and mental anguish, past and future; his physical disfigurements or deformities, as well as his proved future loss of earning power; we cannot in good conscience say that the verdict rendered was unjust or excessive or that it was the product of sympathy, prejudice, mistake, or the result of any other improper conduct on the part of the jury. The verdict is not 'so grossly excessive as to shock our sense of justice.' "

Judgments affirmed.