## Meehan, Appellant, *v.* Philadelphia Electric Co.

Argued December 6, 1966. Before BELL, C. J., MUS-MANNO, JONES, EAGEN, O'BRIEN and ROBERTS, JJ.

*Alan Kahn,* with him *Winokur & Kahn,* for appellant.

*Michael A. Foley,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, January 20, 1967:

Louis Meehan, an electrician, was working on overhead electric wires when, brushing against a wire from which the insulation broke off, he sustained an electric shock which caused him to fall and sustain serious injuries. He brought a suit in trespass against the Philadelphia Electric Co., owner of the electric installation. At the trial, after he had presented all his evidence, the trial judge, upon motion by the defendant, gave binding instructions in favor of the defendant and the plaintiff appealed.

The Court below said that the plaintiff had not proved negligence on the part of the defendant; that, even if the plaintiff showed some defect in the insulation, there was no proof that the defendant had actual or constructive notice of the defect; and that, in any event, the plaintiff was guilty of contributory negligence as a matter of law.

It is common knowledge that electricity is a highly dangerous agent and when it passes through a wire in sufficient voltage to be injurious to those who come into contact with it, the wire should be insulated if fore-

seeably it may be touched by man or beast. The plaintiff's case is predicated on the proposition that the wire which electrically burned Meehan and felled him to the ground was not properly insulated. "A company supplying electricity which is well known to be a dangerous agent, is bound not only to know the extent of the danger but to use the very highest degree of care practicable to avoid injury to everyone who may be lawfully in proximity to its wires and liable to come accidentally or otherwise in contact with them. . . It has frequently been held that the failure to insulate wires so placed is negligence." (*Shapiro v. Phila. Electric Co.,* 342 Pa. 416.)

The plaintiff had been sent by his employer to the plant of Rolling Rock Beer Distributors at 27th and Huntingdon in Philadelphia to tear out some old wires and install new ones. Working at the top of a ladder 18 to 20 feet above the ground he had installed the new wires and then descended to test the motors run by the electric current. He discovered that the wires had been connected in such a fashion that the motors ran in the wrong direction. He testified that in doing this job he had to operate on a trial and error basis because there was no way to "tag the motors" or to know "which wire was which from the roof to the metering because they were burned out. If I could have known which wire was which, I could have hooked up the insulation so that the motors would run in the proper direction but because they were burned out, it was a fifty-fifty chance, we had to hook them up, and if they don't go in the right direction, we make the proper changes."

He reascended the ladder and made the changes. In unscrewing the nut which had been turned rather tightly on the connector he exerted a muscular strength which caused the nut suddenly to turn and the plaintiff's right arm dropped to a bank of three wires be-

neath. His arm fell against one of the three wires conducting 220 volts of electricity. The resulting shock threw him into the 5 wires above upon which he had been working. He fought against these wires and then lost control and fell 18 feet to the ground.

The plaintiff testified at the trial that when his arm scraped against the wires below him, the insulation broke off easily. Should insulation detach so easily? How useful would be a scabbard made of tissue paper, in containing a sword? The degree of care required on the part of an electric company was outlined in *Yeager v. Edison Elec. Co.*, 242 Pa. 101, where this Court said: "Prudence requires those in control of a deadly current of electricity to exercise the highest degree of care in protecting the wires at points where persons in the course of their lawful employment are liable to come in contact with them."

To demonstrate that the electric company here did not exercise the kind of care required in the circumstances, the plaintiff presented Morton H. Lerner, expert witness, who testified that the insulation covering the telltale wire was inadequate, that insulation for 120-to-240 voltage should have a 600 volts rating, rather than the one which enclosed it. He said further that if the insulation had been in good condition, the plaintiff would have felt no shock; also that the effective life of insulation of this type runs from 7 to 12 years. The wires here in controversy had been originally installed in March, 1927, and the company had no records to show that the wires had ever been renewed from 1927 until after the accident of November 9, 1959. Obviously, if the longevity of insulation is limited to 12 years and the accident occurred 32 years after the application of insulation, a question of fact would arise for the jury to determine whether this was not such a lack of maintenance as would spell out negligence. "The duty is not only to make the wire safe

by proper insulation, but to keep it so by constant oversight and repair." *Fitzgerald v. Edison Electric Co.,* 200 Pa. 540.

The expert said that wires should be inspected from time to time to determine whether the insulation has deteriorated. The defendant company stated in answer to interrogatories that the wires had been inspected on the day prior to the accident but in view of the fragility of the insulation, as evidenced by its coming loose from the brushing against it of the plaintiff's arm, a question of fact inevitably followed as to whether the inspection was efficient and reliable. There is no magic to the word *inspection.* Inspection must encompass a serious, sincere, sufficient scrutinization to ascertain defects before it can be regarded a reliable inspection. Whether the inspection measured up to these criteria was also a question of fact for the jury.

The learned court below said that if the insulation had actually deteriorated, there was no proof that the defendant had any notice of it. The fact that the company saw the wires the day before the accident is about as effective a notice as can be conjured. The testimony of the defendant's general superintendent on the age of the wires was not very effective in refuting the plaintiff's claim or bolstering the defendant's defense: "Q. Your records then show, do they not, that there were some service wires in place on that building that we are talking about in March of 1927. A. That's correct. Q. And by service wires, I mean, of course, overhead wires that came from the pole out in the street and attached to brackets on the side of the building? A. There were some service wires in place. Q. And are you telling us you don't know whether they were ever changed up until September, 1959? A. That's correct."

The trial court saw contributory negligence in the action of the plaintiff in his original installation of the new wires and concluded that this contributory negli-

gence was the proximate cause of the accident: "Had the wires been properly connected in the first place it would not have been necessary for the plaintiff to readjust them and if he had not fastened the nut in such a tight connection it would have more easily turned for removal. . . Thus, it was the plaintiff's own acts which set in motion the chain of events which led to his injuries, and not the condition of the insulation on the wires."

This is a non sequitur in reverse. As we have already seen by the plaintiff's testimony, there was no infallible way of determining the separate identification of the wires since they had been burned out and there was only a "50-50 chance" of restoring the wires correctly at the first attempt. To charge this experienced electrician with having set in motion the chain of events which led to his injuries is like charging a pedestrian with contributory negligence if he is run down by a speeding car because the pedestrian was on his way to the store to buy bread which could not be obtained on a previous trip to the store. What Meehan did prior to the act which brought about the stripping of the wire was history and not causation. In *Fitzgerald v. Edison Electric Co.*, 200 Pa. 540, the plaintiff was injured when, in performing a painting job, he went up on the roof of his house and here came into contact with negligently installed electric wires. The trial court entered a compulsory nonsuit, charging contributory negligence. We reversed, Justice MITCHELL saying: "It is said that there was no evidence that it was necessary for him [the plaintiff] to go on the roof to do the painting. No such evidence was required. His convenience was reason enough. It was convenient for him to get at the cornice in that way and he had a right to do so. . . Whether the means he took were such as a prudent man should have taken is not so clear that it can be determined by the court."

In *Stark v. Lehigh Foundries, Inc.,* 388 Pa. 1, this Court said: " ' " " 'One who negligently creates a dangerous condition cannot escape liability for the natural and probable consequences thereof, although the innocent act of a third party may have contributed to the final result.' And when there are two contributing acts, it is not proximity in time that determines which of them is the proximate cause of the resulting injury." ' "

The court below also said that if the plaintiff had not screwed the nut so tightly, he would not have had to use force to unscrew it and if he hadn't used force, his arm would not have touched the defectively insulated wire. But the only way to attach a nut, especially where electric wires are involved, is to attach it securely. Otherwise, the electric apparatus will not work and there will be no way of knowing whether the connection has been properly made or not. In initially using a parachute all cords must be properly tied and knotted as if this were to be the only time it was to be used. Otherwise, it might well indeed be the only time it is used. To charge the plaintiff here with being author of his own fall from the ladder because he screwed a nut tightly and then had difficulty in unscrewing it is like charging a carpenter with negligence in driving a nail too deeply when that is the only possible way of putting two pieces of wood together. In any event, the whole question of the nut was for the jury and not for the judge to determine. A judge, with all his jurisprudential erudition, is not necessarily an expert on nuts.

While detaching and attaching the wires here in dispute the plaintiff did not wear rubber gloves. The trial court found contributory negligence in this. The plaintiff, in explaining why he did not wear rubber gloves, said: "Q. In other words, you said you would never use insulating gloves because somebody gave you ones that were defective? A. Yes. Many of the old

timers in the industry will not use insulated gloves because they become dry rotted and worn and they always advise the young fellows, depend on your own knowledge and your own skill to protect yourself, do not depend on things like worn gloves or rubber gloves that may have holes in; make sure you're well-insulated from the ground and well-insulated from any other wires. BY MR. FOLEY: Q. In other words, take care of yourself? A. Take care of yourself, yes, sir."

Incidentally, the plaintiff said that Stephen Musial, the plaintiff's superior in the company with which the plaintiff worked, did not wear gloves. Moreover, the offensive wire seemed to be wholly safe because, as the plaintiff testified, it was "an insulated wire": "Q. Before you proceeded to get the shock, will you tell us what the bottom wire looked like? A. The bottom wire was an insulated wire and the system was a typical, old Philadelphia Electric System, and the two wires were insulated, they were covered."

Anyhow, the glove question, like the nut question, was a matter for the jury and neither factor acquired such a substantiality that, on it, the judge was warranted in directing a verdict for the defendant.

During the course of the expert Lerner's testimony, reference was made to the National Electric Code and the standards it proclaims on the subjects of care and safety. The court granted defendant's counsel's motion to strike all testimony regarding the Code because it excluded public utilities. The witness explained: "This is a code, which is basically written by the fire underwriters, to make safe installations within and around buildings. Its main cause and effect is insurance and insurance ratings. A utility company is not covered by the same type of insurance ratings, and I do not think they are connected with this code in any way."

When defendant's counsel renewed his motion to strike, the plaintiff's counsel said: "This code has no effect of law. We do not contend that it had, but it is evidence of a proper standard of care and it is offered only for that reason. It describes insulation similar to this insulation, and whether it has application to public utilities or not does not matter. It set up a standard which I think the jury can consider. We do not contend this has the effect of law."

It would appear that the Code in question, for the purpose offered, was another window opened to shed additional light on the standard of care required in the installation and maintenance of electric wires. The learned court below should not have shut it.

Judgment reversed with a procedendo.

Mr. Chief Justice BELL, Mr. Justice EAGEN, Mr. Justice O'BRIEN and Mr. Justice ROBERTS concur in the result.

Mr. Justice JONES dissents.