JULIA GALLAS, ADMINISTRATRIX *AD PROSEQUENDUM* OF THE ESTATE OF STEPHEN GALLAS, DECEASED. PLAINTIFF-RESPONDENT AND CROSS-APPELLANT, v. PUBLIC SERVICE ELECTRIC AND GAS CO., DEFEND-ANT-RESPONDENT, AND HATCO CHEMICAL COMPANY, A DIVISION OF W. R. GRACE & COMPANY, A CORPORA-TION, AND W. R. GRACE & COMPANY, A CORPORATION, DEFENDANTS-APPELLANTS AND CROSS-RESPON-DENTS, AND BETHLEHEM STEEL CORPORATION-BUF-FALO TANK DIVISION, DEFENDANT-RESPONDENT.

Argued Ferbuary 3, 1970—Decided May 18, 1970.

Mr. *Alan E. Davis* argued the cause for cross-appellant (*Mr. Henry M. Spitzer,* of counsel; *Messrs. Wilentz, Goldman* and *Spitzer,* attorneys).

Mr. *Herman H. Wille, Jr.,* argued the cause for respondent Public Service Electric and Gas Company (*Mr. Luke A. Kiernan, Jr.,* attorney).

*Mr. Edward E. Kuebler,* argued the cause for appellants Hatco Chemical Company, a division of W. R. Grace & Company, a corporation, and W. R. Grace & Company, a corporation.

*Mr. John M. Walsh,* argued the cause for respondent Bethlehem Steel Corporation — Buffalo Tank Division (*Messrs. O'Mara, Schumann, Davis & Hession,* attorneys).

The opinion of the Court was delivered by

FRANCIS, J. In this wrongful death action plaintiff Julia Gallas, administratrix *ad prosequendum,* sued the defendants Public Service Electric and Gas Co., W. R. Grace & Company, and Bethlehem Steel Corporation to recover for pecuniary loss suffered by her and her four children as the result of the death by electrocution of her husband Stephen Gallas.[1] At the trial, defendants' motions for involuntary dismissal were granted at the close of the case. The Appellate Division reversed the judgment in favor of Grace and ordered a new trial. The judgments for Public Service and Bethlehem were affirmed. *Gallas v. Public Service Electric & Gas Co.,* 106 *N. J. Super.* 527 (App. Div. 1969). Thereafter we granted the petition of Grace and cross-petition of Gallas for certification. 54 *N. J.* 566 (1969).

I.

The record discloses that on January 23, 1964, Grace contracted for the construction by Bethlehem of a steel water storage tank on the former's chemical plant premises at Fords, New Jersey. The plant was a large one covering a considerable land area. The tank was to be 40 feet in diameter and 33 feet high with a capacity of 300,000 gallons.

---

[1] This state of the record is the end result of a number of procedural operations involving the defendants. It is not necessary to detail them here.

Bethlehem subcontracted the construction of the tank to K. L. O. Welding Erectors which was to use fabricated steel supplied by Bethlehem. K. L. O. was engaged in the construction of steel tanks, smoke stacks and water towers. The decedent had been in its employ as a welder for eight to ten years before his death.

The tank foundation was built by others not involved in this action. Construction of the foundation began sometime in late 1963 and was completed around September 7, 1965. It consisted of a concrete ring wall extending about four feet into and about two feet above the ground. Inside the ring, layers of compacted soil were placed and the top layer which was six to twelve inches in depth was penetrated with oil. The steel tank was to be slightly smaller in circumference so as to fit inside the concrete wall with its base resting upon the compacted soil. The purpose of the oil was to protect the bottom plates of the tank. The foundation was located 50 to 75 feet from uninsulated high tension power lines crossing Grace's property, which carried 26,400 volts of electricity and were owned, maintained and serviced by Public Service. There were no signs of any kind near or on the poles to which the wires were attached or on the wires themselves warning of the injurious consequences of contact with the wires. The lines were 26 feet 2 inches above ground in conformity with the minimum requirements of the National Electrical Safety Code. The purpose of the lines was to supply electrical power to the Grace plant. Some distance from the job site, there was a substation designed to transform the high voltage carried by the overhead lines to such lower voltage as was usable within the plant. Public Service inspected the power lines on the Grace property at two or three month intervals. Its representatives made such inspections on January 26, March 12, July 7, and September 21, 1965.

Directly underneath the uninsulated high power lines and about at right angles thereto, Grace maintained a well paved access roadway for the use of its employees, delivery people

and visitors to the plant. This access road ran "right next" to the tank construction site. In the vicinity of the roadway, the job site and the overhead wires, Grace stored a large number of metal drums. At the time of the accident one hundred to two hundred drums were piled there two and three high.

In the early morning of September 21, 1965 a K. L. O. crane was brought to the scene and left in the Grace parking lot on the trailer on which it had been transported. The crane was on caterpillar treads and was powered by a gasoline motor. The boom was 26 feet high and could be raised and lowered and swung in a full circle by the operator. The crane was to be used in lifting and putting the steel plates in place as the tank was constructed.

On the following morning, September 22, three K. L. O. employees, the crane operator, Ivan, and two welders, Gural and Gallas, reported at the work site around 8 A.M. A tractor-trailer also arrived bringing the steel plates to be used in their work. With the aid of the driver of that tractor, the K. L. O. employees undertook to move the parked crane-bearing trailer to the job site. In doing so, they hauled the trailer through the plant gate at the far end of the parking lot and along the access road (which had a slight downward incline toward the job site) to a point a short distance from the concrete circular tank foundation. Before the crane could be unloaded the trailer had to be backed down the access road a very short distance farther and in the direction of the overhead wires in order to permit an oil delivery truck to pass. The crane was then backed off the trailer through the use of skids approximately 18 feet long, and brought to a stop on the roadway three or four feet beyond the skids. At this time the boom was in its fully lowered position.

The crane operator, Ivan, noticed a faulty load cable on the boom and asked Gallas to assist him in replacing it with a new one. In making such an installation the practice

is to raise the boom in order to insure that this cable remains taut and in proper position around the metal drum located on one side of the caterpillar body. The operation was almost completed and Ivan started to raise the boom when another truck driver using the access roadway asked that the crane be moved so that he could pass. Ivan acquiesced and backed the crane down the road another 30 feet or so in the direction of the overhead electric lines. At this resting place, if a line were drawn down to the road from the closest wire, the front of the radiator of the caterpillar would be about 10 feet from that line. The crane ("cherry picker" as the men called it), was about 5 to 10 feet from the stacked metal drums mentioned above and at a distance variously estimated at between 50 and 80 feet from the job site.

According to the testimony no one connected with Grace or Public Service informed Ivan or his fellow workmen of the highly dangerous current being carried in the overhead wires. And as heretofore noted, there were no signs warning of the danger on or near the poles or the wires. Ivan, who was aware of the presence of the electric wires, raised the boom upward to a 70 degree angle, revolving the drum as he did so to take up the new cable. Gallas was on the ground standing between the crane and the metal drums, using a "bull pin" (a foot long piece of tapered steel) to insure a tight wrap on the drum. While Gallas was in that position and the top of the boom about 12 to 14 feet from the overhead wires, contact was made in some manner with the lowest wire. Ivan testified that the "hog line" — a supporting cable extending outward some 8 to 10 feet at its widest point from the boom and backward from the top of the boom to the rear of the crane — was at least three feet from the nearest wire before the accident; afterward, however, it was in contact with the wire. He said also that he was not causing the boom to move at the time, and the caterpillar was at a standstill with the brakes on. He offered no explanation as to the cause of the contact, and his con-

clusion with respect thereto was stricken on defendants' motion. It would not be unreasonable, however, for the jury to infer that the downgrade of the roadway at that point played a part in producing some movement of the vehicle in the direction of the wire.

When the contact was made, the deadly electric current passed through Gallas' body and caused his death. Ivan leaped from the crane and immediately was "bolted" about 10 feet to the right of Gallas. He said the whole area seemed electrified including the cherry picker and the Grace metal drums, both of which other witnesses described as "sparking." A truck driver who happened to be near the scene ran to help Gallas but when he was about a foot away and started to reach for Gallas the current apparently arced to him throwing him back 10 to 12 feet and burning both his hands. According to this witness, an electrical engineer who was working nearby threw a wooden mallet at the cable and broke off the contact. Gallas' body was then removed.

As part of the effort to demonstrate negligence on the part of the defendants, plaintiff produced Dr. John P. Newton, an electrical engineer, as an expert witness. Newton, whose qualifications were not questioned, was a professor of electrical engineering at Rutgers University. Among other things, for 20 or 25 years he had engaged in consultation work in high voltage phenomena, high voltage insulators and the performance of electrical equipment under various sorts of high voltage circumstances.

Some time after this accident Dr. Newton visited the Grace premises and examined the conditions there with respect to the uninsulated high power lines and their location. In his opinion, the condition and location of the lines clearly indicated that they could be expected to present great hazards to persons working in their vicinity. He said also that considering the nature of the chemical manufacturing business it could reasonably be expected that structures such as tanks might be erected on the premises; further that in the course

of construction, electricity conducting objects such as pipes, structural steel and similar things might reasonably be expected to be put in place by erection equipment. Under such circumstances, in his view, it was not in accordance with good practice to install in the described location uninsulated wires such as these carrying such high voltage. He asserted that the service could have been supplied by underground cables or, if that were not possible for some reason he could not "conceive of," then the installation "should have been very clearly marked with signs." These signs should be located reasonably near the uninsulated overhead conductors and should point out "to any person engaged in operations near these lines the great hazard" they presented.

Some confusion arose in interpreting the witness' testimony because of the many references on cross-examination to the National Electrical Safety Code. As a result, the trial court apparently got the impression that his testimony about the installation and maintenance of the uninsulated overhead dangerous wires constituting a departure from good practice was based upon Dr. Newton's construction of the Code's language. Since the trial judge felt that construction of that document was his prerogative and since there was no express provision requiring underground installation of such electric wires or posting of warning signs, at the close of the case he struck out the expert's testimony. In our judgment such action constituted legal error. The witness' statements can fairly be read to mean that, apart from the Code, failure to put such dangerous wires underground or to place warning signs on or near the poles or the wires amounted to a departure from good electrical engineering practice. Then in relation to the Code, he was saying that the specified failure violated its section 211 which provides:

"All electrical supply and communication lines and equipment shall be installed and maintained so as to reduce hazards to life as far as practicable."

Although neither the overall testimony nor the hypothetical question put to the witness were models of clarity or factual exactitude, nevertheless they were sufficient for jury consideration and that body should have been permitted to evaluate their probative worth. On retrial, we assume the subject will receive more precise attention. See *Stanley Co. of America v. Hercules Powder Co.*, 29 *N. J. Super.* 545, 564 (App. Div.) *rev'd on other grounds*, 16 *N. J.* 295 (1954).

The Appellate Division does not appear to have been entirely satisfied that the expert's testimony should have been stricken. *Gallas v. Public Service Electric & Gas Co.*, *supra*, 106 *N. J. Super.* at 538. However, because of its approval of the trial court's holding on the basic issue of negligence, it found no prejudicial error in the striking of the testimony.

As was noted earlier, at the close of the entire case the trial court granted the motions for judgment in favor of all defendants. It held that plaintiff had not shown that Public Service had any notice or knowledge of the use of a high rise crane in the vicinity of its wires. Consequently, the mishap causing Gallas' death was not reasonably foreseeable and there was no duty on the part of the company to post signs warning of the hazardous quality of the uninsulated wires. After alluding to the absence of any specific requirement in the Safety Code for warning signs in situations such as existed here, it concluded that in the absence of knowledge of decedent's employer's operation, there existed no common law obligation to post or give warnings. Support for the ruling and the affirmance thereof in the Appellate Division was said to be found in *Manning v. Public Electric & Gas Co.*, 58 *N. J. Super.* 386 (App. Div. 1959). As our recently filed opinion in *Black v. Public Service Electric & Gas Co.*, 56 *N. J.* 63 (1970) reveals, we have rejected *Manning* as a controlling precedent. As *Black* holds, accidents of the type involved in the present case are reasonably foreseeable and even in the absence of expert testimony a jury

question exists as to whether failure of the power company to post signs on the poles or the uninsulated wires warning persons engaged in such a lawful operation of the hazard of contact with them. For this reason, as it is more fully explained in *Black,* the judgment in favor of Public Service must be reversed and the matter remanded for retrial.

## II.

The Appellate Division reversed the trial court's judgment in favor of defendant Grace. It noted that since Gallas was an invitee, Grace was duty-bound to exercise due care to maintain the premises in a reasonably safe condition for all purposes embraced within the invitation. 106 *N. J. Super.* at 541. It held that accidents of the type involved in this case are reasonably foreseeable, and therefore the jury should have been permitted to decide whether, having in mind the nature of the work to be performed, care commensurate with the risk required the taking of reasonable precautions to prevent injury to workmen engaged to construct the tank. 106 *N. J. Super.* at 542. We agree with that conclusion and therefore affirm the order for a new trial. See *Stark v. Lehigh Foundries,* 388 *Pa.* 1, 130 *A.* 2d 123 (1957); and cf. *Love v. Virginian Power Co.,* 86 *W. Va.* 393, 103 *S. E.* 352 (1920). Grace being charged with knowledge of the hazard arising out of contact with the uninsulated wires, clearly it was for the jury to say whether it should have posted warning signs in the area of its construction work, or given actual and express notice of the danger to the caterpillar crane crew, or taken other reasonable safety measures to avoid the mishap and the consequences which resulted in Gallas' death.

## III.

With respect to defendant Bethlehem Steel Corporation we concur in the view of the trial court and the Appellate Division that there was a total absence of proof that Beth-

lehem was exercising any control over the construction work at the time of the accident.

## IV.

For the reasons stated, the judgment in favor of Public Service is reversed and a new trial ordered. The judgment of the Appellate Division reversing the judgment for Grace and ordering a new trial is affirmed. The judgment in favor of Bethlehem is affirmed.

No. 85:

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal* — NONE.

No. 86:

*For reversal and remandment* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance* — NONE.