423 F.2d 66
 Joe Ernest DUNNAWAY, Adm. of the Estate of Joseph McKnight, Dec'd
v.
DUQUESNE LIGHT CO., a Penna. corp., Appellant,
v.
ALLEGHENY CONTRACTING INDUSTRIES, INC., a corporation.
 No. 17807.
 United States Court of Appeals Third Circuit.
 Argued September 26, 1969.
 Decided January 7, 1970.
 Rehearing Denied February 18, 1970.
 
 Bernard J. McAuley, Wayman, Irvin, Trushel & McAuley, Pittsburgh, Pa., for appellant.
 George Shorall, Royston, Robb, Leonard, Edgecombe, Miller & Shorall, Pittsburgh, Pa., for appellee.
 Before HASTIE, Chief Judge, and McLAUGHLIN and VAN DUSEN, Circuit Judges.
 OPINION OF THE COURT
 HASTIE, Chief Judge.
 
 
 1
 Allegheny Contracting Industries was under contract with the Commonwealth of Pennsylvania to construct a bridge across Chartier's Creek in Allegheny County, Pennsylvania. The bridge was part of an extensive redevelopment project covering approximately 20 to 30 square blocks. Chartier's Creek runs from east to west, and the bridge spanned it in a north to south direction. On the south side of the bridge, set back from the bridge and running parallel to the creek, was a 69,000 volt power line owned and maintained by the appellant Duquesne Light Company. The power line was suspended from towers 500 feet apart and was 39.4 feet from the ground at the point where the accident occurred. The height required by safety regulations was 23 feet.
 
 
 2
 Construction on the bridge began early in 1965. In late spring, about four to six weeks before the accident, a crane was employed to pour the three piers or support columns of the bridge. About a week to ten days before the accident, Allegheny's general superintendent and job superintendent decided to utilize a crane to pour the concrete floor of the bridge. For this purpose a new section was added to the boom of a crane on the north side of the creek, extending its length to 100 feet, approximately double its former length. The northern portion of the bridge floor was poured first. On either the night before or the morning of the accident, this newly lengthened crane was walked around to the south side of the bridge. The crane was positioned underneath the wires, with the cab to the south of the wires and the boom extending north over the bridge at any angle of 35 to 40 degrees. The crane was equipped with a bucket attached to the boom by steel cables. The bucket would be filled with concrete from trucks on the bank of the creek and then swung back over the bridge to be dumped. Joseph McKnight, along with several of his fellow workers, all employed by Allegheny, would manually guide the bucket to the proper spot to be dumped. As each load of concrete was released from the bucket the boom would naturally rise.
 
 
 3
 The pouring began in the middle of the bridge and continued back toward the south shore. When one line of pavement was completed, the crane would be backed up to position it for the next line. The angle of the boom was never changed and, as the work progressed, it was brought inevitably closer to the overhead wires. The accident occurred around noon while the workmen were in the process of releasing concrete from the bucket. The boom came in contact with the electrical line and the resulting charge travelled down the steel cables to the bucket electrocuting workman McKnight.
 
 
 4
 Plaintiff, a Tennessee administrator, brought this suit against Duquesne Light Company, a Pennsylvania corporation, claiming damages under the Pennsylvania Wrongful Death and Survival statutes for the death of Joseph McKnight. Duquesne joined decedent's employer Allegheny Contracting Industries as a third-party defendant. The jury found that both defendants negligently caused the accident, and returned a verdict of $75,000 for the plaintiff. Duquesne Light Company moved for a judgment notwithstanding the verdict, and in the alternative, for a new trial. This is an appeal from the denial of those motions.
 
 
 5
 Federal jurisdiction in the present case is based upon diversity of citizenship. Therefore, the law of Pennsylvania provides the legal rules and principles in accordance with which liability must be determined.
 
 
 6
 Duquesne contends that there was insufficient notice of the dangerous situation to place it under a duty to act, and that, assuming sufficient notice existed, Allegheny's awareness of the dangerous situation relieved Duquesne of liability for the accident.
 
 
 7
 In support of its second contention, Duquesne asserts that under Pennsylvania law an electric company with notice of a person in dangerous proximity to its wires can satisfy its duty by merely warning the person of the danger involved, but that, in the present case, such a warning would have been superfluous and was, therefore, unnecessary because Allegheny knew the exact voltage carried by the electric line and was fully aware of the danger involved in operating a crane beneath it.[1] However, Duquesne's interpretation of Pennsylvania law is incorrect. A warning does not automatically discharge an electric company of its duty to those in proximity to its wire. Rather, a warning is only one element to be considered by the jury in determining whether the electric company has exercised reasonable care[2] to protect against the danger. Hamilton v. United States, W.D.Pa.1956, 143 F.Supp. 179; Commonwealth Trust Co. of Pittsburgh v. Carnegie-Illinois Steel Co., 1945, 353 Pa. 150, 44 A.2d 594.
 
 
 8
 The adequacy of a warning in relieving an electric company from liability must depend on both the expected efficacy of the warning and the availability of more effective alternate precautions. Experience has taught that from time to time a crane operator with full knowledge of the danger will bring the boom in contact with overhead wires.[3]
 
 
 9
 In the present case, as in Commonwealth Trust Co. of Pittsburgh, supra, the electric company could have taken a simple alternate precaution which would have completely eliminated the danger. Duquesne's Superintendent of Personnel, Transmission, and Distribution testified that the electric line could easily have been de-energized with no resulting strain on the system. We agree with the court below that it was for the jury to decide whether in all of the circumstances precautions short of de-energizing the line met the high standard of care which the law imposed upon Duquesne.
 
 
 10
 Different considerations control the separate issue whether Duquesne had such notice of the danger as would obligate it to take preventive action. Of course an electric company is bound to anticipate the customary uses of the land beneath its wires. Duquesne provided normally adequate protection against those uses by locating and maintaining its lines some sixteen feet above the height required by safety regulations. But the accident in the present case was the result of a very unusual occurrence, the operation of a crane with a 100 foot boom beneath the lines. Thus, a critical question arose whether the facts were sufficient to charge Duquesne with notice of such a dangerous situation.
 
 
 11
 Duquesne had no actual knowledge of the crane's actual or prospective use immediately beneath its wires. The crane had not been in position under the lines a sufficient length of time to have been discovered in ordinary course of inspection or observation. However, the question remains whether Duquesne, through other facts of which it had knowledge, should have anticipated that the crane would be used under the lines at or about the time of the accident.
 
 
 12
 Duquesne was aware of the bridge construction and of the general redevelopment program. It also had knowledge of the use of cranes and other equipment in the general construction area. However, such knowledge alone is insufficient to charge Duquesne with notice that a crane would be used under its wires. In Reed v. Duquesne Light Co., 1946, 354 Pa. 325, 47 A.2d 136, and Stark v. Lehigh Foundries, Inc., 1957, 388 Pa. 1, 130 A.2d 123, the Supreme Court of Pennsylvania held that such notice could not be imputed from an electric company's knowledge of the use of cranes in the general area of the high tension wires. In those cases as in the present case, "the position of the crane on the day of the accident immediately underneath the power line was not permanent." Stark v. Lehigh Foundries, Inc., 388 Pa. at 14, 130 A.2d at 131. A reasonable periodic inspection by the electric company would not have revealed any crane under or dangerously close to the lines unless the inspection happened to occur the day of the accident. "To hold, in such circumstances, that the Light Company had reason to know that cranes were being used in the locality of the power lines, would be tantamount to imposing upon the Light Company a duty to keep the land underneath the lines under constant surveillance. And, such was not the Light Company's duty." Reed v. Duquesne Light Co., 354 Pa. at 330-331, 47 A.2d at 139.
 
 
 13
 In Luketich v. Duquesne Light Co., 1957, 389 Pa. 87, 132 A.2d 268, the electric company, aware of the general boundaries of planned construction, removed its lines to one of the boundaries. Some two and a half months after the lines were relocated, a crane used in the construction came in contact with those lines electrocuting two workmen. The court found the facts insufficient to put the defendant on notice of the danger and stated that the electric company "had no reason to remove the wires until notified that it would be necessary or proper because of the work being performed." 389 Pa. at 91, 132 A.2d at 270.
 
 
 14
 In the present case it does appear that Duquesne had been party to a pre-construction planning conference with Allegheny. The conference informed Duquesne of the path of the planned construction which was to pass directly under the high voltage line.[4] But, knowledge of eventual construction work under its lines did not reasonably indicate that a crane would be used for such work.[5]
 
 
 15
 A reasonable alternate method of pouring the concrete was available. Allegheny's job superintendent testified that motorized concrete buggies could have been used instead of cranes. Allegheny possessed such buggies and had used them previously. Actually, Allegheny's decision to use the crane rather than an alternate mechanism was not reached until approximately a week before the accident.
 
 
 16
 Moreover, even if Duquesne could have anticipated that a crane might at some time be used to pour the southern portion of the bridge, it had no notice when this would occur. This case does not present the situation where a crane has been proceeding for some time along a continuous path toward the electric line. Prior to the date of the accident, the crane had been used only on the other bank of the creek. The northern half of the bridge had been poured a week to ten days before the accident. That job took only one day to complete. The record does not show that the crane was in use or where it was positioned the remainder of the time. To hold in such circumstances that Duquesne should have anticipated that the crane was likely to be under its wire at or about the time of the accident, "would be tantamount to imposing upon the Light Company a duty to keep the land underneath the lines under constant surveillance. And, such was not the Light Company's duty." Reed v. Duquesne Light Co., supra.
 
 
 17
 In these circumstances, we think a jury could not reasonably find that Duquesne had such notice of the danger in question as would obligate it to take affirmative action. For this reason Duquesne's motion for dismissal of the complaint despite the verdict should have been granted.
 
 
 18
 The judgment will be reversed.
 
 
 
 Notes:
 
 
 [1]
 The evidence discloses that the general superintendent, job superintendent, crew foreman, and crane operator were all apprised of the high voltage carried in the overhead line and of the danger of their operation. The plaintiff argues that a satisfactory warning under Pennsylvania law demands that knowledge of the danger be brought home to the injured party himself. The evidence is unclear whether McKnight was aware of the danger involved. However, the question whether a supplier of electricity must warn each worker of the danger or may satisfy his duty by warning their employer, is unclear under Pennsylvania law. The Pennsylvania Supreme Court has held that a landowner employing an independent contractor to work in proximity to a gas line need only warn the contractor. Valles v. Peoples-Pittsburgh Trust Co., 1940, 339 Pa. 33, 13 A.2d 19. Language in Mathis v. Lukens Steel Co., 1964, 415 Pa. 262, 270-272, 203 A.2d 482, 486-487, leaves some doubt as to whether this doctrine extends to cases where the dangerous condition involves the use of electricity. See Cooper v. Heintz Mfg. Co., 1956, 385 Pa. 296, 122 A.2d 699; Stark v. Lehigh Foundries, Inc., 1957, 388 Pa. 1, 130 A.2d 123; Kube v. Bethlehem Steel Corp., 3d Cir. 1968, 390 F.2d 506; Note, Delegation of Possessor's Duty to Warn the Employee of an Independent Contractor of Dangerous Conditions on the Land, 106 U.Pa.L.Rev. 1041, 1043-44 nn. 15 & 17 and accompanying text. Our conclusion that a warning is not necessarily dispositive of an electric company's duty makes unnecessary the resolution of the above stated doubtful issue of Pennsylvania law
 
 
 [2]
 Under Pennsylvania law an electric company as the supplier of a dangerous agent is under a duty "to use the very highest degree of care practicable to avoid injury to every one who may be lawfully in proximity to its wires * * *." Fitzgerald v. Edison Elec. Illuminating Co., 1901, 200 Pa. 540, 543, 50 A. 161, 161-162. "[N]o absolute standard of duty in dealing with such agencies can be prescribed * * * [e]very reasonable precaution suggested by experience and the known dangers of the subject ought to be taken." MacDougall v. Penna. Power & Light Co., 1933, 311 Pa. 387, 393, 166 A. 589, 591, quoting from Koelsh v. Philadelphia Co., 1893, 152 Pa. 355, 362, 25 A. 522, 524
 
 
 [3]
 The courts have recognized that the negligence of operators of mechanical equipment in coming in contact with electric lines is not so extraordinary as to excuse the electric companies from liability for their own negligence. Skoda v. West Penn. Power Co., 1963, 411 Pa. 323, 191 A.2d 822; Bowser v. Publicker Indus., Inc., 1951, 101 F.Supp. 386, aff'd. per curiam, 192 F.2d 933. InBowser the court stated, "Certainly, no one knowing the way in which a crane operates * * * would regard it as highly extraordinary that he should swing the boom so that the cable would come too close to the power line." Id. at 387-388.
 
 
 [4]
 A clear picture of the line in relation to the construction work does not appear in the trial transcript. The best description is in the pre-trial depositions particularly that of Brozik. It appears that the electric line was set back somewhat from the bridge's southern abutment. However, the construction work was not to end at the southern abutment of the bridge. A new road, which crossed directly under the wires and connected with the bridge, was also under construction by Allegheny
 
 
 [5]
 At the pre-construction planning conference, no mention was made of the problem of overhead lines or of the use of cranes for work on the bridge