Evelyn BLOOM, et al.,

v.

WASTE MANAGEMENT, INC., et al.,

v.

UNITED STATES of America and United States Army Corps of Engineers,

v.

WASTE MANAGEMENT, INC., et al.

Evelyn BLOOM, et al.,

v.

UNITED STATES of America and United States Department of the Army, Corps of Engineers.

Civ. A. Nos. 83–4706, 84–3406.

United States District Court, E.D. Pennsylvania.

Aug. 9, 1985.

Paul J. Senesky, Richard K. Hohn, Galfand, Berger, Senesky, Lurie & March, Philadelphia, Pa., for plaintiffs.

John J. Tinaglia, Wendy R. Fleishman, Ballard, Spahr, Andrews, & Ingersoll, Philadelphia, Pa., for Philadelphia Elec. Co.

Joseph P. Green, Krusen, Evans & Byrne, Philadelphia, Pa., for American Dredging Co.

James J. Donohue, Christopher P. Leise, White & Williams, Philadelphia, Pa., for Warner Co.

Rachel Shao, Asst. U.S. Atty., Philadelphia, Pa., for U.S. and U.S. Dept. of the Army, Corps of Engineers.

## OPINION

LUONGO, Chief Judge.

This wrongful death and survival action [1] arises from the death of Lonnie Bloom (Bloom) during the course of his employment with the American Dredging Company (American Dredging or American). Named as defendants are The United States, United States Department of the Army, Corps of Engineers (collectively as the Government or Corps of Engineers), Warner Company (Warner), several companies apparently related in some fashion to Warner, Philadelphia Electric Company (PECO), and American Dredging. Now before me are motions for summary judgment on behalf of PECO, American Dredging, the Government and Warner. For the reasons that follow, I will grant the motions.

### I.

On September 29, 1981, Lonnie Bloom was electrocuted when he attempted to tie a ground wire to an overhanging electric power line, apparently in an effort to obtain greater clearance for his bulldozer. At the time of his death, Bloom was performing his duties as an assistant foreman for American Dredging Company. American had been engaged as a contractor by the Corps of Engineers to complete certain dredging between Philadelphia, Pennsylvania and Trenton, New Jersey on the Delaware River. The property on which the accident took place is located in Falls Township in Bucks County, Pennsylvania. The land, owned by Warner Company, was the subject of an easement under which the Government or its contractor was entitled to use the property as a disposal site for soil and sludge removed from the river base.

### II.

Philadelphia Electric Company has filed a motion for summary judgment which no party has opposed. PECO's amply supported motion demonstrates that the electrical lines, poles, and related equipment used to convey electricity across the Falls Township tract were sold to Warner Company in 1942 and 1943. Since that time PECO has continued to supply power to Warner, but has performed no maintenance and has exercised no control over the poles and lines located on Warner's land.

From this factual record, PECO argues that, as a matter of law, it cannot be held liable for Bloom's death. I agree. Plaintiffs have failed to articulate or support any basis for holding PECO liable. PECO is not responsible for the placement of Warner's electrical lines and poles, and there is no suggestion that PECO had notice of the ongoing dredging operations in a manner that should have caused it to cease supplying power. *See Dunnaway v. Duquesne Light Co.*, 423 F.2d 66 (3d Cir.1970) (supplier of electricity not liable where it was not on notice of crane operating in proximity to lines which it owned). PECO's motion for summary judgment will therefore be granted.

### III.

American Dredging Company has filed a motion for summary judgment against all parties except the United

---

1. Plaintiffs' action against the United States was filed separately after exhaustion of administrative remedies. By Order dated October 2, 1984, I consolidated the cases for all purposes.

States.[2] Like PECO's motion, American's motion has drawn no opposition. It is undisputed that American was the decedent's employer, and that Bloom was performing work-related tasks when his accident occurred. American thus argues, and I conclude, that Pennsylvania's Workmen's Compensation Statute bars suit both on behalf of the decedent/employee and by any other defendant seeking non-contractual contribution or indemnity. 77 P.S. § 481(a), (b); *Weldon v. The Celotex Corporation*, 695 F.2d 67 (3d Cir.1982). I will therefore grant American Dredging Company's motion as to all parties except the United States.

### IV.

#### A. *The Contentions*

The Government's motion for summary judgment presents a more substantial question. Pointing to the Army Corps of Engineers' limited involvement in the actual dredging operation, the Government argues that Pennsylvania law would not impose liability for Bloom's death against a private party in the Government's position. But assuming that Pennsylvania law is to the contrary, the Government further contends that it cannot be held liable because of limitations of the United States' waiver of sovereign immunity in the Federal Tort Claims Act.

The factual predicate for the Government's motion is supplied by the contract between the Government and American Dredging Company, an outline of American Dredging's worker safety program, and various affidavits and depositions submitted by the parties. The Government relies primarily on the affidavit of Stephen J. Lalli, a construction inspector assigned by the Army Corps of Engineers to monitor the performance of American Dredging. Taken together, the Government contends the documents supporting its motion demonstrate that the Army Corps' inspection program was designed, and was in fact

exercised, for the limited purpose of assuring that American Dredging was fulfilling its contractual obligations.

The legal basis for the Government's motion under Pennsylvania law is, essentially, the general rule that one who entrusts work to an independent contractor is not liable for the negligent acts or omissions of the contractor. *See* Restatement (Second) Torts § 409. The Government denies that any of the relevant exceptions to the rule apply because: (1) the Government did not have superior knowledge of an ultrahazardous condition, (2) the Government did not retain control over the work of the independent contractor, and (3) the source of the danger was an open and obvious condition. Finally, the Government contests plaintiffs' effort to characterize the Army Corps as possessor of the disposal site.

Pennsylvania law notwithstanding, the Government argues that the Federal Tort Claims Act does not permit imposition of liability against the United States on the facts of this case. The Government points out that its liability must be predicated on a finding of negligence by Government employees, and not on theories of strict liability or vicarious liability for the torts of its independent contractor. Addressing plaintiffs' allegation of negligence on the Army Corps' behalf, the Government argues that the claim is nonetheless barred by the discretionary function exception. The Government's discretionary function argument rests on the premise that the Secretary of the Army's patent discretion to contract out dredging work encompasses also his judgment as to the degree to which the Corps of Engineers would enforce safety regulations for the protection of a contractor's employees.

Plaintiffs and the Warner Company have opposed the Government's motion for summary judgment. Plaintiffs assert three theories of liability against the Government. Joined by Warner Company, plain-

---

**2.** Because of the contractual relationship between American Dredging and the United States, those parties, with my approval, agreed

to postpone the Government's response to American's motion until after I disposed of the Government's motion for summary judgment.

tiffs first contend that the Government was in possession of the disposal site, but failed to use reasonable care to protect Bloom, a business invitee, from an unreasonable risk of harm about which the Government knew or should have known. *Giannone v. United States Steel Corp.,* 238 F.2d 544 (3d Cir.1956); Restatement (Second) Torts § 343. Second, plaintiffs contend that the Government is liable because the Army Corps should have recognized that the overhanging electric wires presented, in the absence of "special precautions," a "peculiar unreasonable risk of physical harm" to workers at the disposal site, but failed either to require by contract that American Dredging safeguard the worksite or to take such precautions on its own. Restatement (Second) Torts § 413; *Toole v. United States,* 588 F.2d 403 (3d Cir.1978) (duty to warn contractor or its employee arose where Government had superior knowledge of special danger); *Gonzalez v. United States Steel Corp.,* 484 Pa. 277, 398 A.2d 1378 (1979). Third, plaintiffs assert that the Government retained control over the dredging operation and the energized wire at issue in this case. Restatement (Second) Torts § 414; *Byrd v. Merwin,* 456 Pa. 516, 317 A.2d 280 (1974); *DiSalvatore v. United States,* 456 F.Supp. 1079 (E.D.Pa.1978).

In response to the Government's discretionary function argument, plaintiffs and the Warner Company deny that their theories of liability effectively seek review of policy-laden governmental decisions. In their view, the Government's liability for Bloom's death arises from its breach of rather mundane duties of care shared by all possessors of land and employers of independent contractors.

## B. *Discussion*

The Federal Tort Claims Act, 28 U.S.C. § 1346(b), vests jurisdiction in the district courts over suits against the United States for damages

for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

Under the Act, the Government is liable with respect to tort claims "in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674.

■ The waiver of sovereign immunity embodied in the Tort Claims Act, however, is subject to several important limitations and exceptions. As a threshold matter, the Act authorizes suit against the United States only on account of the negligent or otherwise wrongful conduct of a Government employee. Thus excluded from the Act's coverage are theories of strict liability and vicarious liability for the torts of independent contractors. *Laird v. Nelms,* 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972); *United States v. Orleans,* 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976).

■ The jurisdiction conferred by the Tort Claims Act is also subject to several exceptions the effect of which is to preclude liability notwithstanding that state law would impose liability on a similarly situated private party. The most prominent of these exceptions is the discretionary function exception, 28 U.S.C. § 2680(a). As recently interpreted by the Supreme Court in *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* ——— U.S. ———, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), the discretionary function exception bars any lawsuit in which the gravamen of the plaintiff's complaint directly or indirectly challenges a decision which Congress intended to insulate from judicial review through the medium of a common law tort suit.

The starting point for any case under the Federal Tort Claims Act, however, is the plaintiff's case against the Government under principles of otherwise applicable law, here the law of Pennsylvania. In the case at bar, therefore, I will first determine whether there exists a genuine issue of

material fact with respect to a theory of liability involving the negligence or wrongful conduct of Government employees. For the reasons that follow, I conclude that the Government is entitled to summary judgment on the basis of principles of state tort law. For the most part, therefore, I need not decide whether the suit is barred by the discretionary function exception.

At the outset, it should be made clear that the record abundantly supports the Government's contention that its supervision of the dredging operation was exercised simply to assure the Government that it was receiving the benefit of its bargain. Both the Government's contract with American Dredging Company and the affidavit of Stephen Lalli demonstrate that American Dredging, an independent contractor, retained and exercised responsibility for the daily operation of the landfill as well as the safety of American Dredging's employees. Although Lalli reported minor safety violations to American Dredging supervisors and felt he had the authority to stop work if he perceived a life-threatening hazard, his routine duties were to monitor the level of water in the dikes and to measure "spillway density" to assure that dredged material was not being returned to the river.

The Army Corps' limited involvement in the actual dredging operation is confirmed by the Corps' minimal presence on the Falls Township tract. Whereas American Dredging employed approximately fifty employees and various subcontractors to operate the disposal site twenty-four hours a day, seven days a week, the Corps assigned only Lalli to inspect the site on a forty hour per week basis. Consistent with this limited supervisory role, the Corps did not assign inspectors to the site on weekends.

On the basis of this record, I conclude that the Government cannot be held liable as possessor of the land on which Bloom's death occurred. Confronted with far greater evidence of the Government's supervision of a contractor, our court of appeals has reversed as clearly erroneous a district court finding that the Government was in possession of a construction site. *Fisher v. United States*, 441 F.2d 1288 (3d Cir.1971). In *Fisher*, the district court concluded that the Government had possession of a construction site on the basis of evidence that the Government assigned to the project a "resident engineer" who had "general charge of the construction" and the "authority to require the contractor's compliance with a safety plan." *Id.* at 1290. The record also contained evidence that the Government assigned two or more "inspectors whose duties included seeing that the work was done in accordance with specifications, enforcing safety regulations, and issuing safety directions." *Id.* at 1290–1291 (footnotes omitted). Despite this evidence, the court of appeals overturned the district court's finding that the Government had possession of the site. The appellate court's rationale requires rejection of the present effort to characterize the Government as possessor of the Falls Township tract:

> The law of Pennsylvania makes it clear that one who employs an independent contractor may also employ a person to ascertain that the work is done according to plans and specifications and that the employment of such a person in no way indicates that the independent contractor is being subjected to control.... This is a corollary to the long recognized general right of inspection and supervision that an owner normally enjoys and exercises to insure his receiving from the contractor the benefit or total performance bargained for. In employing those men, the United States was only seeking to protect itself and to insure that the contractors were performing in the manner required of them under the contract.... We conclude that the district court's finding that the United States was in possession of the site based on the presence of the Government's engineer and inspectors was clearly erroneous.

*Id.* at 1291 (citations and footnote omitted). *See also Brletich v. United States Steel Corp.*, 445 Pa. 525, 285 A.2d 133 (1971).

Plaintiffs make much of an isolated statement by Francis Branagan, an employee of the Warner Company, reporting a conversation he had with unspecified representatives apparently of the Army Corps of Engineers. When deposed on the issue of Warner's involvement at the location of the accident, Branagan responded that he made occasional visits but no inspections, and that his request to have certain dredged materials relocated was rebuffed by someone who added that the Army Corps "runs it." Taking this remark out of context, plaintiffs claim that the record shows the Army Corps' pervasive control over the operation. I cannot agree. The record is otherwise barren of evidence that the Government troubled itself with the details of operating this project. Standing against the Government's unequivocal affidavit demonstrating the Army Corps' limited role, Branagan's statement is insufficient to create a genuine issue of material fact.

Under a similar analysis, plaintiff's third theory of liability, premised on Restatement (Second) Torts § 414, must be rejected. In this regard plaintiffs contend that the Government is liable for Bloom's death because it controlled the dredging operation and the energized wires at issue in this case.

Section 414 permits imposition of liability against an employer of an independent contractor who "retains the control of any part of the work ... for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." *See Byrd v. Merwin,* 456 Pa. 516, 317 A.2d 280 (1974).

Although there has been some uncertainty as to the level of control over a contractor that is required to subject an employer to liability under section 414, there has emerged a consensus that liability may not be imposed simply because the employer retained either the general power to stop work or the right to inspect and supervise the results of the contractor's operation. Retention of such powers is consistent with the employer's legitimate interest in assuring itself that the contractor is properly fulfilling its obligations. Rather, to establish liability under section 414, it is necessary to show that the employer retained control over the manner of the contractor's work or the operational detail of the construction project, and that the employer's negligent control of the work caused physical harm. *See generally, Byrd v. Merwin, supra; Hurst v. Triad Shipping Co.,* 554 F.2d 1237 (3d Cir.), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977); *Fisher v. United States, supra; Marshall v. Southeastern Pennsylvania Transportation Authority,* 587 F.Supp. 258, 264–266 (E.D.Pa.1984); *Sharkey v. Airco, Inc.,* 522 F.Supp. 646, 650–652 (E.D.Pa.1981) (section 414 properly invoked where "retained control is tantamount to reservation of the power to direct the manner in which contractors produce the result...."), *aff'd mem.,* 688 F.2d 824 (3d Cir.1982); *Toole v. United States,* 443 F.Supp. 1204, 1223–24 (E.D.Pa.1977), *rev'd on other grounds,* 588 F.2d 403 (3d Cir.1978).

Liability under section 414 is therefore based directly on the negligence of the employer; it is not a theory of vicarious liability for the contractor's misdeeds. *Hurst v. Triad Shipping Co., supra; Sharkey v. Airco, Inc., supra; Moss v. Swann Oil, Inc.,* 423 F.Supp. 1280, 1282 (E.D.Pa.1976), *aff'd mem.,* 566 F.2d 1168 (3d Cir.1977).

■ Application of section 414 to the Government as an employer of an independent contractor requires particular attention to the Tort Claims Act's limitation of liability to that caused by the negligence or other malfeasance of Government employees. Our court of appeals and other appellate courts have "consistently held that the United States cannot be vicariously liable for injuries to workmen on Government construction sites, solely because the Government has retained control over the work and safety practices of the independent contractor whose negligence caused the injury." *Gibson v. United States,* 567 F.2d 1237, 1243 (3d Cir.1977), *cert. denied,* 436 U.S. 925, 98 S.Ct. 2819, 56 L.Ed.2d 768

**1010**

(1978). In short, to impose liability against the Government under Restatement (Second) Torts § 414, it is necessary for the plaintiff to show: (1) that the Government retained control over the manner of contractor's work or the operational detail of the project, (2) that the manner in which the Government or its employees controlled the contractor constituted negligence or an otherwise wrongful act, independent of fault attributable to the contractor, and (3) that the Government's negligence or wrongful act caused physical harm.

Applying this standard to the facts of this case, plaintiffs' claim under section 414 cannot survive the Government's motion for summary judgment. As discussed above, our court of appeals specifically rejected the contention, and a district court's finding, that the Government exercised control over a contractor by inspection and supervision of the results of the contractor's work. *Fisher v. United States, supra.* The evidence of Government involvement was far greater in *Fisher* than plaintiffs have been able to muster in the case at bar. The record in this case is devoid of any suggestion that the Government controlled either the manner in which American Dredging conducted its operation or the operative detail of the dredging project. I must therefore grant the Government's motion for summary judgment as to plaintiffs' section 414 claim.

Plaintiffs' lone remaining theory of liability against the Government is premised on Restatement (Second) Torts § 413 and the variation of § 416 or § 427 liability enunciated by our court of appeals in *Toole v. United States,* 588 F.2d 403 (3d Cir.1978). Under section 413 plaintiffs contend that the Government is liable because the energized wires in the vicinity of dredging operations presented, in the absence of "special precautions" an "unreasonable risk of

physical harm," and that the Government failed either to require American Dredging to take special precautions or to take such precautions itself. Under *Toole v. United States,* plaintiffs claim that the Government had superior knowledge of the special danger presented by energized wires, but failed to warn either American Dredging or Bloom of the danger.[3]

Section 413 of the Restatement imposes liability against

[o]ne who employs an independent contractor to do work which the employer should recognize as likely to create, during its progress, a peculiar unreasonable risk of physical harm to others unless special precautions are taken ... for physical harm caused to them by the absence of such precautions if the employer

(a) fails to provide in the contract that the contractor shall take such precautions, or

(b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions.

Interpreting analogous language in sections 416 and 427 of the Restatement, the courts have held that the presence of uninsulated energized electric wires in close proximity to a construction zone is a condition that an employer should recognize as likely to create an unreasonable risk of harm in the absence of special precautions. *Nationwide Mutual Insurance Co. v. Philadelphia Electric Co.,* 443 F.Supp. 1140, 1144–45 (E.D.Pa.1977); *Colloi v. Philadelphia Electric Co.,* 332 Pa.Super.Ct. 284, 297, 481 A.2d 616, 622–23 (1984) (underground power line). *See also Philadelphia Electric Co. v. James Julian, Inc.,* 425 Pa. 217, 228 A.2d 669 (1967) (underground gas main).

As a theory of direct negligence on the part of an employer, however, section 413

---

**3.** Plaintiffs also ascribe to the Army Corps a "non-delegable duty" to prevent "peculiar unreasonable risks" to the employees of independent contractors. To the extent this theory imputes liability without fault of Government employees it is not available under the Federal Tort Claims Act. *Gibson v. United States,* 567 F.2d 1237,

1242–44 (3d Cir.1977), *cert. denied,* 436 U.S. 925, 98 S.Ct. 2819, 56 L.Ed.2d 768 (1978). To the extent liability is predicated upon the Government's own negligence with respect to the special danger, this contention adds nothing to plaintiffs' claims under section 413 and *Toole v. United States.*

limits the duty imposed by that section in accord with the attenuated relationship between an employer and the employees of his independent contractor. In particular, both the Restatement and Pennsylvania caselaw enable the employer to satisfy his duty by providing in the contract that the contractor must take the special precautions necessitated by the peculiar hazards attendant to the work. Restatement (Second) Torts § 413(a); *Gonzalez v. United States Steel Corp.*, 484 Pa. 277, 398 A.2d 1378 (1979). This is in contrast to rules of vicarious liability contained in sections 416 and 427 of the Restatement which do not permit an employer to avoid by contract its responsibility for a contractor's negligence. *See* Restatement (Second) Torts § 416, comment c.

■ In the case at bar, the record demonstrates that the Government satisfied its duty under section 413 by requiring American Dredging to abide by safety regulations which, if followed, would have prevented Bloom's death. In relevant portion, the contract between the Government and American Dredging Company required American Dredging to comply with Army Corps of Engineers Manual EM 385-1-1 (June 1, 1977), which was entitled "General Safety Requirements." Contract No. DACW 61-81-C-0166, ¶ 52(a). Although the Army Corps' safety manual has not been made part of the record in its entirety, the record makes clear that the manual included several provisions compliance with which by the contractor would have prevented Bloom's accident. For example, as recited in the Army Corps' internal report on the accident, paragraph 11a17 provided "When moving equipment under or near energized lines, a designated employee shall be utilized to determine that required clearance is maintained." United States Army Corps of Engineers, Board of Investigation Report at 5. More importantly, also as related by the report, paragraph 15e08 provided in part:

> Operations adjacent to overhead lines are prohibited unless one of the following conditions is satisfied: (a) Power has been shut off and positive means taken to prevent the lines from being energized. (b) Equipment or any part thereof does not have the capability of coming within the following minimum clearance from energized overhead lines, and equipment has been positioned and blocked to assure no part thereof including cables can come within the following minimum clearances.

POWER LINES MINIMUM
NOMINAL SYSTEM KV REQUIRED CLEARANCE

50 or under . . . . . . . . . . . . . . 10 feet (3.05m)

. . . . .

> A notice of the minimum required clearance shall be posted at the Operator's position. Electric line derrick trucks and aerial lifts shall not be required to comply with this requirement.

*Id.* at 5–6.

■ Plaintiffs do not dispute that provisions of the safety manual addressed operation of equipment in the vicinity of overhead electric lines, or that compliance with the regulations would have prevented Bloom's death. Indeed, it is plaintiffs' contention that the Government's liability (as the alleged possessor of the disposal site) arises from the lack of compliance with the same safety regulations which were included in the 1981 edition of the safety manual. Plaintiffs' contention misses the mark. A contractor's failure to comply with the safety manual does not give rise to liability against the Government under the Federal Tort Claims Act. *LeSuer v. United States*, 617 F.2d 1197, 1198–99 (5th Cir.1980). To the contrary, inclusion of adequate safety regulations in the manual, made binding on the contractor by the contract, discharges the Government's duty as an employer under section 413.

■ Closely related to plaintiffs' cause of action under section 413 is plaintiffs' claim under *Toole v. United States, supra.* In *Toole,* our court of appeals predicted that Pennsylvania law would recognize a cause of action against an employer of an independent contractor for harm to the contractor's employees which was caused by

the employer's failure to give warning of a special danger about which the employer had superior knowledge. Relying on Pennsylvania's adoption of sections 416 and 427 of the Restatement, the court reasoned that Pennsylvania's courts would, if the question were presented, impose a duty on an employer to prevent accidents avoidable through communication of the employer's particular expertise. The court determined in that case that the Government was negligent for failing to warn a contractor engaged in manufacturing anti-tank explosives about the inadequacy of tests of a safety shield. The Government had superior knowledge of the danger because Government employees recognized, but failed to call to the contractor's attention, that the Government's safety manual required far more severe testing than the contractor had conducted.

In the instant case, however, the "superior knowledge" theory of negligence is of no assistance to the plaintiffs. As an initial matter, I have some doubt whether the presence of *overhead* power lines on a construction site could be deemed a "special danger" within the intent of *Toole v. United States.* Although an employer of an independent contractor may well have a duty to disclose the presence of concealed hazards or dangers that an independent contractor should not be expected to comprehend, the peril associated with overhead wires near mobile equipment has so long been recognized by contractors engaged in such activity that imposition of liability against the employer would make little sense under a theory of the *employer's* negligence.

More importantly, the record in this case simply does not permit a reasonable inference that the Government had "superior knowledge" of the danger. If nothing else, the record demonstrates that American Dredging Company was acutely aware of the hazard presented by overhead wires.

Robert L. Berg, a general superintendent and vice president of American Dredging at the time of the accident, testified at deposition that he was aware of the lines before the accident and that he instructed his subordinate, Richard M. Mascio, to treat the lines as energized, and to instruct personnel to treat them likewise and to stay away from them. Stanley Forrest, Bloom's immediate supervisor, confirmed in his deposition that he received instructions from Berg and Mascio. His orders were to consider the lines "hot." He was further directed to instruct his employees to treat them as "hot," to stay at least thirty feet from the wires, and not to work underneath them. Forrest stated that he relayed those instructions to Bloom, and that he warned his employees about the wires at safety meetings conducted every other Monday during the project.

In response to this evidence, plaintiffs respond that a genuine issue of fact exists as to whether Bloom was personally informed of the danger of overhead wires. Plaintiffs also argue that liability may be imposed because the Army Corps did not warn American Dredging or Bloom that the wires were *in fact* energized. Neither contention has merit. Assuming arguendo that Bloom did not receive a personal warning, liability on the part of the Government is foreclosed by the fact that Bloom's employer had notice of the danger and recognized its obligation to caution its employees. To rule otherwise would require the Government and other employers of independent contractors to provide individual notice to all members of the often fluid workforces of their contractors. Plaintiffs have identified no precedent imposing such a duty, and I decline to so extend the obligations already imposed by Pennsylvania law.[4]

Equally unavailing is plaintiff's attempt to impose liability because American

---

**4.** To hold otherwise would raise serious questions under the discretionary function exception. It is conceded by all parties that the Army Corps has the discretion to complete dredging projects through independent contractors. A significant portion of that discretion would effectively be eviscerated by imposition of a duty to ensure that each employee of an independent contractor received proper warnings.

Dredging had not been informed of the actual use of the electric wires. This is indeed a tenuous distinction when it is apparent that the contractor recognized the *risk* that the lines were energized. In any event, uncontested testimony establishes that not all wires traversing the Falls Township Tract on the same poles were energized. Under these circumstances, the only prudent warning would have required that all lines be treated as "hot." This, of course, was precisely American Dredging's policy.

In short, on the record of this case I conclude that none of the theories of liability articulated by plaintiffs can form the basis for liability against the United States. I must therefore grant the Government's motion.

## V.

### A. *The Contentions*

Warner Company's motion for summary judgment also requires extended analysis. Plaintiffs' claim against Warner rests on Warner's ownership and alleged control of both the land and the energized wires on which Bloom's accident occurred. In response, Warner's motion for summary judgment attacks virtually every necessary element of plaintiffs' cause of action in tort. Warner resists plaintiffs' effort to characterize it as possessor of the Falls Township tract, contending that it transferred possession of the site to the Army Corps of Engineers well before the date of the accident. With respect to its conceded ownership of the power lines, Warner argues: (1) that it discharged its duty by warning the Army Corps and American Dredging of the danger, (2) that any breach of duty on the part of Warner cannot be the legal cause of Bloom's death because both the Army Corps and American Dredging had actual knowledge of the hazard, (3) that Bloom's supervisors at American Dredging warned him of the danger, (4) that the danger was open and obvious, and (5) that it was not reasonably foreseeable that workers on the disposal site would take the extraordinary steps taken by Bloom to come in contact with the power lines.

Plaintiffs and the Government have opposed. Warner's motion. Plaintiffs assert two theories of liability against Warner. First, contending that Warner had far greater involvement with dredging operations than its motion suggests, plaintiffs claim that Warner remained bound to observe the duty of care owed by possessors of land to their business invitees. *Giannone v. United States Steel Corp.*, 238 F.2d 544 (3d Cir.1956); Restatement (Second) Torts § 343. Plaintiffs dispute Warner's assertion that it conveyed the disposal site to the Army Corps. Together with at least some of the Government's memoranda of law, plaintiffs note that the conveyance executed by Warner in favor of the Government was termed an "easement."

Plaintiffs' second theory of liability centers on Warner's ownership and control of the energized power lines. Plaintiffs point out that Pennsylvania law has long required suppliers of electricity and those in possession of energized wires to exercise the highest standards of care for the safety of persons foreseeably in the proximity of their wires. *See Colloi v. Philadelphia Electric Co.*, 332 Pa.Super. 284, 292–94, 481 A.2d 616, 620–21 (1984), and cases cited therein. From that premise plaintiffs contend that Warner breached its duty to Bloom by failing to provide an adequate warning of the danger and in failing to take other steps such as elevation or relocation of the lines.

Plaintiffs contend that a genuine issue of fact exists as to whether Bloom was warned of the danger in view of his intentional contact with the line and his contemporaneous statement that the lines were not energized. Plaintiffs further argue that even an actual warning would not have discharged Warner's duty under the Pennsylvania Supreme Court's decision in *Stimmel v. Kerr*, 394 Pa. 609, 148 A.2d 232 (1959). Also relying on *Stimmel v. Kerr*, plaintiffs deny that the danger presented by the wires was open and obvious, and

they invoke the presumption that the decedent exercised due care for his own safety.

With respect to the warnings given to the Army Corps and American Dredging, plaintiffs dispute whether any Warner representative notified American Dredging of the existence of the lines, and they contest the adequacy of any warnings so given. Finally, plaintiffs claim that the circumstances of this accident were reasonably foreseeable because Warner Company or its contractor built the dikes as part of Warner's agreement with the Government, and used heavy equipment on top of the dikes when doing so. Plaintiffs argue that it was therefore foreseeable that the dikes would need repair or fortification and that a contractor would use heavy equipment on top of the dikes to complete that operation.

## B. *Background*

Resolution of Warner Company's motion for summary judgment requires, in the first instance, a careful review of Warner's involvement at the Falls Township tract and the circumstances of Bloom's accident. The record makes clear that Bloom's accident took place at a Falls Township, Pennsylvania disposal site known as area 24D/25. The land, owned by Warner Company, was the subject of a conveyance through the Temporary Delaware River Spoil Disposal Easement Agreement, dated August 15, 1980. The agreement enabled the Army Corps to deposit dredged materials from the Delaware River onto the disposal site, and to excavate drainage ditches and build retaining walls in furtherance of that project. The agreement was originally negotiated as a one year agreement, and was extended to two years on May 8, 1981.

Warner concedes that its contract with the Army Corps required Warner, through its subcontractor, to construct a dike to specifications supplied by the Army Corps. It is also apparent that Warner built the dike at issue in this case, that there was an opening in the dike in the area of poles which carried the power lines, and that Warner eventually finished the dike. Although based on hearsay and not directly relevant, there is some suggestion that Warner required American to leave the opening in the dike to permit Warner to remove sand and gravel until American was about to take over.

When finished, the apex of the dike was approximately seventeen or eighteen feet beneath the electric wires which crossed the dike in the northeast section where the accident occurred, and again in the southern portion. Also crossing the dike at the site of the accident, however, were two other lines, a neutral electrical wire and a telephone wire. Although the precise distance between the top of the dike and the telephone wire is not clear, it is apparent that it was low enough to prevent passage of Bloom's Komatsu front end loader, a bulldozer ten feet in height.

Warner continued to work in the vicinity of the dikes from the time American Dredging first assigned employees to the project in June, 1981 until approximately July, 1981 at which time Warner turned over the dike to the Army Corps. Thereafter, Warner assigned no employees to the Falls Township tract, and had no authority to direct disposal operations. The record also establishes that Warner had no contractual relationship with American Dredging, and no authority to alter the Government's specifications for the disposal site.

On the date of the accident, Bloom was operating his front end loader together with his subordinate, George Roane. At some point the Army Corps' inspector, Stephen Lalli, determined that water in the dike was too close to the apex of the dike, and that dredged materials were being returned to the river in an excessive amount. In response to Lalli's direction that corrective action be taken, Richard Mascio and Stanley Forrest ordered Bloom to reinforce portions of the southern end of the dike, but not to disturb the northern wall. Bloom and Roane completed their assignment, but then began to drive the front end loader along the top of the wall of the dike toward the northern side. With Bloom preceding the front end loader on foot, the front end loader traveled north until the point at which the lines crossed the dike.

Recognizing that the bulldozer would not pass beneath a low-hanging telephone line, Bloom climbed onto the hood of the front end loader, seized the telephone line and fastened it to the neutral electrical wire. Although the clearance thus provided measured approximately eleven feet, Bloom then ascended to the roof of the cab of the front end loader, apparently seeking to obtain greater clearance by affixing the lower wires to an overhanging, energized line. Despite Roane's caution that he would not touch the wires, Bloom grasped one of the wires with both hands and was electrocuted.

### C. *Discussion*

■■ Pennsylvania law imposes liability against a possessor of land for physical harm to invitees caused by the possessor's failure to exercise reasonable care. *Giannone v. United States Steel Corp.*, 238 F.2d 544 (3d Cir.1956); *Mathis v. Lukens Steel Co.*, 415 Pa. 262, 203 A.2d 482 (1964); *Beary v. Pennsylvania Electric Co.*, 322 Pa.Super. 52, 469 A.2d 176 (1983). *See also* Restatement (Second) Torts § 343. Pennsylvania law makes clear, however, that title ownership is not a sufficient basis for liability; it is the *possessor* of land that bears responsibility for dangerous conditions that arise on the premises. *Bagley v. Philadelphia*, 148 Pa.Super.Ct. 318, 326, 25 A.2d 579, 582 (1942); *Whitaker v. Hills*, 430 F.Supp. 1389, 1390–91 (E.D.Pa.1977). Under Restatement (Second) Torts § 328E(a), a possessor of land is one "who is in occupation of the land with intent to control it...."

■■ Plaintiffs' effort to characterize Warner as the possessor of the disposal site is plainly inadequate in view of the evidence demonstrating Warner's lack of control over the land subsequent to July, 1981. The record establishes that Warner assigned no employees to the Falls Township tract, had no authority to direct disposal operations, and had no involvement with either the Government's specifications for the disposal site or the contractor chosen to fulfill them. In short, control over the operation of the disposal site was the province of the Government and/or its contractor, not of the Warner Company.

Plaintiffs' (and the Government's) argument that Warner conveyed only "limited rights" through the "easement" transferred to the Government is an attempt to elevate form over substance. From the record before me, it is clear that Warner authorized the Government to conduct a major landfill operation on Warner's land and to exercise exclusive control over it. Designation of the conveyance as an "easement" did not render Warner responsible for premises over which it had ceded control.

Likewise unpersuasive is plaintiffs' contention that Warner Company was significantly involved in the actual dredging operation. Although Warner did, on its own or through a subcontractor, prepare the site for the Army Corps' arrival, Warner's activity at the disposal site ceased well before Bloom's accident.[5]

Plaintiffs' claim against Warner as possessor of the energized power lines presents a more substantial question. As was established by the documents supporting PECO's motion for summary judgment, Warner Company owned the lines and poles used to conduct electricity through the Falls Township tract. Plaintiffs have also identified some evidence that Warner refused to permit relocation of the lines when asked to do so by the Army Corps before dredging began.

■■ Pennsylvania law has long recognized a duty upon those in control of energized power lines to observe a standard of care commensurate with the degree of dan-

---

5. Assuming arguendo that Warner was under an obligation as transferor of the land to warn the transferee of the wires, it is clear that Warner observed that duty. Uncontradicted testimony from Francis Branagan establishes that the Army Corps was warned of the danger. Assuming further that Warner was bound to caution American Dredging, the record demonstrates that any breach of that duty was not the cause of the accident because American Dredging in fact had notice of the danger.

ger imposed by electrical lines. *Fitzgerald v. Edison Electric Illuminating Co.*, 200 Pa. 540, 50 A. 161 (1901). As owner of the wires at issue in this case, therefore, Warner was bound to exercise the highest standard of care practicable to protect those foreseeably in the proximity of its wires.

Warner first contends that it discharged its duty to Bloom by warning the Army Corps and American Dredging of the energized lines. Plaintiffs contest the adequacy of the warnings, and dispute that a warning allegedly given to American Dredging by George Widman, an employee of G.R.O.W.S., Inc., discharged the duty of Warner, apparently a distinct entity. Warner rejoins that the source and adequacy of the warnings are unimportant because the record demonstrates that both the Army Corps and American Dredging had actual notice of the danger and adopted a policy of treating all lines as energized. Thus, Warner concludes, any failure to warn on its part cannot be the legal cause of Bloom's death.

 I need not resolve the parties' dispute as to the source and adequacy of the warnings, for I conclude that Pennsylvania law does not permit a possessor of electric lines to discharge its duty by warning a contractor such as American Dredging or an employer such as the Government. This result is compelled by our court of appeals' decision in *Dunnaway v. Duquesne Light Co.*, 423 F.2d 66 (3d Cir.1970). In *Dunnaway*, suit was brought against a power company on behalf of an employee of a contractor killed when a crane made contact with the power company's wires. On appeal after a jury verdict for the plaintiff, the court of appeals reversed, but concluded in relevant part that the power company did not conclusively discharge its duty to the decedent by warning the contractor that employed him.

A warning does not automatically discharge an electric company of its duty to those in proximity to its wire. Rather, a warning is only one element to be con-

sidered by the jury in determining whether the electric company has exercised reasonable care to protect against the danger.

423 F.2d at 68–69 (footnote and citations omitted). The court of appeals reasoned that a simple warning may not discharge the power company's high standard of care to workers whose attention might be directed to their work and not to the dangers around them.

The adequacy of a warning in relieving an electric company from liability must depend on both the expected efficacy of the warning and the availability of more effective alternate precautions. Experience has taught that from time to time a crane operator with full knowledge of the danger will bring the boom in contact with overhead wires.

*Id.* at 69 (footnote omitted).

Warner next contends that it cannot be held liable because Bloom himself was warned of the danger. Relying on *Dunnaway*, plaintiffs argue that proof of a warning would not entitle Warner to summary judgment. Moreover, plaintiffs dispute that Bloom received such a warning in view of Bloom's conduct and evidence that Bloom stated that the wires were "dead" as he was about to grasp them.

Addressing first the question whether Warner fulfilled its duty by warning Bloom of the danger, I conclude that both the *Dunnaway* decision and the facts of this case preclude my acceptance of Warner's position. Initially, there is no evidence that representatives of Warner Company advised Bloom of the danger, either orally or by posted signs. Warner Company's claim that it observed its duty thus hinges on the adequacy of its warning to Bloom's employer or the Army Corps. For the reasons stated above, such a warning is not dispositive under Pennsylvania law.

More importantly, the court of appeals ruled in *Dunnaway* that warnings issued by a possessor of energized wires are not

conclusive with respect to the question whether the possessor observed its duty of care. Careful review of the court of appeals' opinion demonstrates that this is true even if the possessor gives notice of the danger to the worker subsequently injured. 423 F.2d at 68 & n. 1. The rationale for this rule is that a busy worker's momentary inadvertence is a common risk against which a possessor of electric wires might be expected to take precautions. *Id.* at 69.

It is an entirely different question, however, whether the failure of a possessor of power lines to take precautions other than warning can be deemed the legal cause of harm resulting from the intentional grasp of a wire by a person advised of the danger. It would be an extraordinary principle of law that would impose liability against the possessor for such harm, and were I confronted with that question I would likely conclude either that Bloom's death was not proximately caused by Warner's negligence or that Bloom was an "unforeseeable plaintiff" with respect to Warner's conduct.

I conclude, however, that the record now before me does not establish that Bloom actually received warning that the lines were energized. Some suggestion that Bloom was not warned is furnished by his conduct, which can only be characterized as a determined effort to reach Warner's electrified wire. Of far greater significance is Bloom's statement to his subordinate, George Roane, that the lines were "dead." Bloom's statement is reported in deposition testimony given by Roane and in a certified copy of a report of the accident given by Roane on the day after the accident. Although Roane's deposition does not pinpoint when Bloom made such statements, the testimony suggests that Bloom so advised Roane on more than one occasion. Roane's certified statement reports that the statements were made in response to Roane's attempt to caution Bloom immediately before the accident.

Warner challenges the admissibility of Roane's deposition and certified statement on the ground that these out-of-court statements constitute inadmissible hearsay under Fed.R.Evid. 802 or, at best, limited evidence of Bloom's state of mind under Fed.R.Evid. 803(3). I disagree. Rule 801 defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Specifically excluded from the Rule are statements offered for a purpose other than to prove the truth of what the declarant said. Plaintiffs clearly have not offered Bloom's statements as reported by Roane to prove the truth of what Bloom asserted, namely, that the lines were not energized.

Relying exclusively on Roane's deposition testimony, I conclude that a genuine issue of material fact exists as to whether Bloom was informed of the energized wires. The record contains sufficient evidence for a jury to conclude that Bloom was unaware of the danger at or near the time of his accident. A reasonable jury could infer from that finding that Bloom was not informed of the hazard. Warner's reference to unequivocal testimony to the contrary from Stanley Forrest, Bloom's immediate supervisor, does not change this conclusion; resolution of conflicting evidence is the province of a jury.

Similar reasons compel rejection of Warner's argument that the danger was open and obvious. It should be noted initially that the "open and obvious" rule, derived from Restatement (Second) Torts § 343, is essentially a limitation of the duty of *possessors of land* to use reasonable care to protect invitees from defective conditions on the premises. In view of the more exacting standard of care imposed on possessors of energized power lines, it might not be appropriate to apply a similar limitation to the duty of a defendant sought to be held liable as a possessor of such lines.

In any event, I cannot say as a matter of law that Warner Company's power lines

presented an open and obvious danger to Bloom. I have previously held that a reasonable jury could find that Bloom was not warned of the electrified wires. In the absence of a warning, Pennsylvania courts have consistently refused to equate the mere presence of overhead wires with the existence of an open and obvious hazard. *Stimmel v. Kerr*, 394 Pa. 609, 148 A.2d 232 (1959); *Stark v. Lehigh Foundries, Inc.*, 388 Pa. 1, 130 A.2d 123 (1957); *Brillhart v. Edison Light & Power Co.*, 368 Pa. 307, 82 A.2d 44 (1951); *Fitzgerald v. Edison Electric Illuminating Co., supra. Cf. Repyneck v. Tarantino*, 415 Pa. 92, 202 A.2d 105 (1964) (contributory negligence established where plaintiffs were aware of danger, but allowed crane to touch wires). Warner's attempt to distinguish this line of precedent on the ground that Bloom acted intentionally is not persuasive. That Bloom made a determined effort to reach the energized wire is relevant to the question whether his accident was foreseeable and to the issue of contributory negligence (which has not been argued). Bloom's intent, however, did not convert the danger presented by the wire into an open and obvious condition.[6]

■ Having disposed of Warner's arguments concerning discharge of its duty and Bloom's awareness of the danger, there remains for my consideration Warner's most potent argument, advanced primarily in its first reply memorandum, that the circumstances of Bloom's death were so unforeseeable that it was not under a duty to prevent such an occurrence. In advancing this argument, Warner relies on the court of appeals' decision in *Dunnaway v. Duquesne Light Co.*, 423 F.2d 66 (3d Cir. 1970).

Recognizing that Bloom's death would not have occurred in the absence of what must be regarded as extraordinary conduct on the part of the decedent, plaintiffs nevertheless contend that Warner's involvement with the disposal site put it on notice of the risk of an accident of this sort. Plaintiffs point out that Warner, the owner of the Falls Township tract, built the dike on which Bloom was killed, and that it operated heavy machinery on top of the dike when doing so. Plaintiffs contend that Warner also was on notice that American Dredging employees operated heavy equipment on the dike. From these facts, plaintiffs argue that Warner should have foreseen that the dike might need repair or fortification, that American Dredging employees might drive machinery such as a front end loader on top of the dike, and that an employee of American Dredging might attempt to gain clearance for such a vehicle by manually raising low-hanging wires.

In *Dunnaway v. Duquesne Light Co.*, our court of appeals made clear that a possessor of electrical lines has a duty to take preventative action only as to those dangers reasonably foreseeable to the possessor. The court noted that the possessor is required "to anticipate the customary uses of the land beneath its wires." 423 F.2d at 69. But to hold a possessor responsible for harms resulting from unusual occurrences, the court ruled that the possessor must have notice of the special activity in the vicinity of its lines. *Id.*

Particularly instructive is the *Dunnaway* court's application of that standard to the case before it. As noted above, *Dunnaway* was a case brought against a power company by an employee of a contractor killed when a crane made contact with an energized wire. At the point of impact, the wire was 39.4 feet from the ground. The crane, which had a 100 foot boom,[7] was used to transfer concrete from trucks to an

---

6. Warner's contention that the danger was open and obvious because the wires visibly ran to a nearby energy-consuming plant is not convincing, and the factual basis for that argument is not clearly established by the record.

7. The boom was doubled in size from 50 feet approximately a week to ten days before the accident.

area at the floor of a bridge then under construction. Although the power company had no "actual knowledge of the crane's actual or prospective use immediately beneath its wires," and did not have enough time to discover the crane beneath its wires in the ordinary course of inspection, the company had notice of the general use of cranes and other equipment in the construction area near its lines. *Id.* The court of appeals held that knowledge of the use of such equipment was not sufficient to charge the power company with "notice that a crane would be used under its wires." *Id.* Relying on *Stark v. Lehigh Foundries, Inc.,* 388 Pa. 1, 130 A.2d 123 (1957), the court reasoned that to impute notice of use of a mobile crane beneath the wires would effectively require that the power company maintain constant surveillance over the construction site. Following the Pennsylvania Supreme Court's decision in *Stark,* the court of appeals declined to impose such a duty.

Numerous cases decided in accord with the rationale of *Dunnaway* and *Stark* confirm that mere notice of mobile equipment in the vicinity of power lines is not sufficient to apprise the possessor of the danger; where the lines are sufficiently elevated to preclude contact through ordinary activity, liability can be imposed only if the possessor has notice of the actual use of such equipment in close proximity to its wires. *Kronk v. West Penn Power Co.,* 422 Pa. 458, 222 A.2d 720 (1966); *Luketich v. Duquesne Light Co.,* 389 Pa. 87, 132 A.2d 268 (1957); *Reed v. Duquesne Light Co.,* 354 Pa. 325, 47 A.2d 136 (1946); *Nationwide Mutual Insurance Co. v. Philadelphia Electric Co.,* 443 F.Supp. 1140, 1151 (E.D.Pa.1977); *Guglielmo v. Scotti & Sons, Inc.,* 58 F.R.D. 413, 422–23 (W.D.Pa. 1973).

After careful consideration of the standard set forth in *Dunnaway* in relation to the record in this case, I conclude that no reasonable jury could find that Bloom's accident was foreseeable by Warner. I must therefore grant Warner's motion for summary judgment.

It is clear, primarily, that Bloom's accident did not result from customary activity in the vicinity of Warner's power lines. Contrary to plaintiff's contention, the record is devoid of evidence that either Warner or American Dredging had reason to expect that an employee of American Dredging would attempt to scale with heavy machinery the top of a wall of a *filled* dike. Uncontroverted testimony from Richard Mascio and Stanley Forrest establishes not only that they, as supervisors directly involved with the dredging operation, had no knowledge of any prior incidents involving machinery such as a front end loader on top of the dike, but also that American Dredging strictly forbade any such activity. Likewise uncontroverted is testimony from Mascio and Forrest that both supervisors directly communicated that rule to Bloom. The rather intuitive rationale for prohibiting machinery on top of the dikes is twofold: Heavy machinery on top of a soaked wall of a dike tends to crush the wall, and the steep slopes of the dike make operation of wide equipment at the narrow apex of the wall dangerous to employees.

Plaintiffs' contention that Warner had notice of American Dredging's employees on top of the dike is based on the testimony of Francis Branagan, an employee of Warner, who admitted seeing some equipment on top of unspecified dikes. Branagan's statements, however, provide little suggestion that Warner should have foreseen the use of equipment on top of the dike and near its power lines. Careful review of Branagan's testimony reveals that his knowledge of equipment on top of the dikes was limited, with one possible exception, to the time of *construction* of the dikes. Branagan's testimony provides no evidence that he was aware of any use of machinery in dangerous proximity to the power lines in conjunction with the dredging operations.

Quite apart from the lack of notice of equipment on top of the dike, Warner cannot fairly be charged with notice that Bloom, having put himself in that position, would come in contact with the energized wires. Even after completion of the dike, the clearance between the surface of the dike and energized wires remained approximately seventeen feet, clearly preventing Bloom's bulldozer, a vehicle ten feet in height, from touching the lines.

Undaunted, plaintiffs argue that Warner should have foreseen that an American Dredging employee would attempt to drive heavy machinery along the wall of the dike, that lower-hanging neutral wires would impede passage of the vehicle, and that such an employee would manually raise the wires in an effort to obtain clearance. But as Warner points out, not even prediction of that scenario would have enabled Warner to foresee Bloom's accident. The record in this case is abundantly clear that, having gained clearance for his vehicle, Bloom then climbed onto the top of the cab of his bulldozer, and purposefully reached or jumped to grasp wires above his head. Plaintiffs do not specifically contend that Bloom's effort to reach the overhead wire was foreseeable, and I could not permit a jury to find that such extraordinary behavior should have been anticipated.[8]

■ Plaintiffs' final argument, perhaps resting on the notion that the exceptional character of Bloom's series of acts is relevant only to the issue of contributory negligence, is that Pennsylvania law affords the decedent a presumption that he exercised due care for his own safety. This argument is unavailing. The presumption, of course, gives way upon the introduction of evidence to the contrary. More important-

ly, although relevant to contributory negligence and the question whether any negligence of Warner could be held the proximate cause of Bloom's death, the foreseeability of the decedent's conduct is also relevant to the question whether Warner owed a duty to prevent this accident. The risks against which a possessor of energized wires has a duty to take precaution are limited to those arising from customary activity in the vicinity of its lines and special activity of which the possessor has notice. *Dunnaway v. Duquesne Light Co.* The record in this case establishes that Bloom's operation of the bulldozer at the apex of a filled dike and his purposeful contact with wires from atop the cab of his vehicle were no more customary than operation of a tall crane underneath energized wires. The record fails to establish a basis for a finding that Warner had reason to expect that Bloom would do so.

For these reasons, I conclude that, under the principles set forth in *Dunnaway v. Duquesne Light Co.*, Warner could not have foreseen the circumstances of Bloom's accident, and thus was not obligated to guard against it. I must therefore grant Warner's motion for summary judgment.

---

**8.** Despite plaintiffs' statement to the contrary at oral argument, there is no basis in the record

for a jury to conclude that Bloom was told that the lines were not energized.